## NATIONAL LABOR RELATIONS BOARD v. UNITED MINE WORKERS OF AMERICA et al.

No. 11406.

United States Court of Appeals
Sixth Circuit.

April 28, 1952.

Robert McKinlay, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Dominick L. Manoli, and Margaret M. Farmer, Washington, D. C., on the brief), for petitioner.

Hubert Meredith, Owensboro, Ky. (Hubert Meredith, Owensboro, Ky., B. N. Gordon, Madisonville, Ky., Willard P. Owens, Washington, D. C., on the brief), for respondents.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

PER CURIAM.

This is a petition for enforcement of an order of the National Labor Relations Board issued against respondents.

On June 29 and 30, 1949, a crowd varying in number from 1,000 to 2,500 members of respondent unions, led by Suver and Chaney, union agents, visited six non-union mines in Western Kentucky for the purpose, as stated by Suver, of unionizing "all the non-union mines in the territory." The union agents demanded that the mines be shut down and the miners called out so that the union men might talk to them. The groups varied from 50 to 250 men in the six mines. The immediate cause for resentment was that the men in these mines were working six days a week while under orders of the respondent unions the union men were working only three days a week. When demand was made that the men be called out from the mines for a conference, the sheriff and police patrol officers informed the various superintendents that the union crowd could not be controlled and advised them to comply with the demand.

The project had been carefully organized and planned, for in each mine visited, while the union agents were ordering the management to bring the men up out of the shafts and pits, the union men who followed Suver and Chaney proceeded in a definite pattern of operation. They rounded up all the non-union men working above ground and herded them with force

and constant abuse to a place designated by the union agents for speeches. The union men encircled the non-union men so that they were hemmed in by the overwhelming number of the union group. The union agents then declared that the mines would be closed and the men would not be allowed to work until they had joined the union and collective bargaining contracts had been signed by the management. The non-union men were ordered to raise their hands to show that they would comply with these conditions. When some hands were not raised, abusive epithets were hurled at the non-union men and they were threatened.

At the Homestead Mine, which was visited on June 29, when Chaney called for a show of hands by those who would join the union, attend union meetings, and not resume work until the management signed a union contract, no hand was raised. An angry "roar" and "booing" arose from the masses of union men, and cries of "We'll make them hold up their hands." As a result of the Homestead incident, when the three remaining mines were invaded, at the advice of the police officers and under the instructions of mine representatives, all hands were raised.

At the North Diamond Mine Chaney said, "we have been here and gotten you fellows out once before and this time we are going to see that you stay out. If you return and try to operate this coal mine, by God, we'll be back." At the East Diamond Mine Chaney said the union did not want to have to come back but if they did "it would be bad." At Poplar Ridge one union speaker stated that he was from bloody Williamson county; that he had some men who "just couldn't be controlled" and that if he had to come back he was going to "bring them" with him.

The Board found that the respondents by force and threats of violence had restrained the employees of the various mines in the exercise of their right under the Act to refrain from joining labor unions, National Labor Relations Act, 29 U.S.C. Supp. IV, § 157, 29 U.S.C.A. § 157, and issued the appropriate cease and desist order.

The findings of the Board are sustained by overwhelming evidence. The respondents offered no testimony.

Respondents contend, however, that the gatherings were entirely peaceful and presented none of the aspects of coercion. They point out, for instance, that Suver said at one of the mines, "This is no threat;" but the closing part of that statement was "we'll be back." The record presents certain acts of violence, as, for instance, the assault upon two non-union employees at Poplar Ridge. But we are more impressed by the incident considered as a whole than by specific acts of violence. The mass trespass on company property, the rounding up of non-union men from the mine premises and forced cessation of work, the physical compulsion which was used to prevent their leaving the premises or returning to work after the speeches were over, the constant abuse and threats of physical violence, were highly coercive. It is true that the calling of names under certain circumstances may not amount to coercion; but in the degree to which it was exhibited here it expressed overwhelming hostility. The presence of so many hostile men on mine property and their encirclement of the relatively small groups of non-union workers was coercion.

Respondents also contend that the order of the Board is too broad in that it commands respondents to cease and desist from restraining and coercing not only employees in the six mines involved in the incidents related, but all other employees engaged in mining operations within the geographical limits of the jurisdiction of District 23, United Mine Workers of America.

In view of the purpose of the invasion of these mines, however, which as stated by Suver was that the union group was out to unionize all the non-union mines in the territory, we think this order was a proper exercise of discretion on the part of the Board. Both Suver and Chaney stated in effect that it was their intention to stop the running of scab coal in competition with union mines throughout District 23. The Board found that the serious danger of future unlawful acts of restraint and coercion existed not only with respect to the

six mines involved but also with respect to other non-union employees engaged in mining within the jurisdiction of District 23. The Board has broad power to determine the necessary scope of its orders and it is authorized to restrain other violations the danger of whose commission in the future is to be anticipated from conduct in the past. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; May Dept. Stores Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145.

The order is enforced as prayed for.