NATIONAL LABOR RELATIONS
BOARD
v.
CHAUFFEURS, TEAMSTERS, WARE-
HOUSEMEN & HELPERS LOCAL
UNION NO. 135.
No. 11045.

United States Court of Appeals
Seventh Circuit.
April 21, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Samuel M. Singer, Atty., N.L.R.B., Washington, D. C., Alvin Lieberman, Atty., N.L.R.B., New York City, for petitioner.

Ralph B. Gregg, Edward J. Fillenwarth, Indianapolis, Ind., Gregg, Fillion, Fillenwarth & Hughes, Indianapolis, Ind., of counsel, for respondent.

Before MAJOR, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit Judges.

MAJOR, Chief Judge.

This case is here on petition of the National Labor Relations Board (referred to as the Board), pursuant to Sec. 10(e) of the National Labor Relations Act (referred to as the Act) as amended, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued August 7, 1953, against Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 135, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL (referred to as respondent or the union). The Board's decision and order are reported in 106 N.L.R.B. No. 111. Admittedly, this court has jurisdiction.

The Board found that respondent union, in violation of Sec. 8(b)(4)(A) and (B) of the Act, induced and encour-

aged employees of Hoosier Petroleum Company, Inc., the charging party (referred to as Hoosier Pete) and of other employers to engage in a strike or concerted refusal in the course of their employment to perform services or to use materials, with the objects of (a) forcing or requiring Hoosier Pete to cease doing business with Jesse G. Floyd, an employer within the meaning of the Act, and (b) forcing and requiring Floyd to recognize or bargain with respondent as the collective bargaining representative of his employees, although it had not been certified as the bargaining agent of such employees under the provisions of Sec. 9 of the Act.

The order sought to be enforced in substance requires that the union cease and desist from inducing and encouraging the employees of Hoosier Pete or any other employer to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods or commodities, or to perform any services for their respective employers, where an object thereof is (a) to force or require Hoosier Pete or any employer to cease doing business with Floyd, or (b) to force or require Jesse G. Floyd to recognize or bargain with the union as the collective bargaining representative of his employees, unless and until such labor organization has been certified as such representative in accordance with the provisions of Sec. 9 of the Act.

The contested issues here are whether the Board properly found (1) that Floyd was an independent contractor, and (2) that the union violated Sec. 8(b)(4)(A) and (B) of the Act. The Board's unfair labor practice finding rests on the premise that Floyd was an independent contractor, which in reality presents the primary issue.

On both issues the Board held contrary to the recommendations of the trial ex-

aminer, who found that Floyd was not an independent contractor but operated as an integral part of Hoosier Pete's business so that Hoosier Pete was a co-employer of Floyd's drivers, and further, that even though Floyd was an independent contractor, the picketing occurred in front of Hoosier Pete's filling station, which was also Floyd's place of business, and therefore did not constitute an unfair labor practice. Much stress is placed upon findings of the trial examiner inasmuch as he heard the witnesses and was in a better position than the Board to evaluate their testimony. There is merit in that contention in a case where the Board refuses to accept evidentiary findings made by a trial examiner, but in the instant case we think it of little, if any, consequence because the Board's disagreement with the trial examiner is more concerned with the conclusions which it deduces from the evidentiary facts.

A study of the record is convincing that the facts present a borderline case; particularly is this so relative to the status occupied by Floyd. Little could be gained by an analysis of the cases as to what constitutes an independent contractor because, as this court pointed out in Williams v. United States, 7 Cir., 126 F.2d 129, 132, they furnish little, if any, assistance in solving the question as each case depends in the main upon its own facts.

Briefly, Hoosier Pete, an Indiana corporation, was engaged in the business of selling petroleum products through filling stations which it owns and operates, one of which was located at 1211 West Washington Street, Indianapolis, Indiana, known as Station No. 7. Hoosier Pete's general office was located at 2037 East Washington Street. Floyd owned tractors which he leased to Hoosier Pete for the purpose of hauling its tank trailers used in the delivery of its product.[1]

---

1. Technically, Floyd's lease was with the Vortex Petroleum Company which, while a separate corporate entity, had common officers and stockholders with Hoosier Pete. Both the trial examiner and the Board treat the two corporations as though they are a single entity; hence the Vortex Company need not be further referred to.

Each of the tractors leased by Floyd to Hoosier Pete bore Floyd's inscription, while the trailers bore that of Hoosier Pete. The lease between Floyd and Hoosier Pete provided, among other things, that Floyd's tractors were to be used exclusively in hauling the trailers of Hoosier Pete; that Floyd was to furnish responsible drivers, keep the tractors in good operating condition and pay operating costs, and that he was to insure the tractors against loss by fire, theft and collision. The lease further provided that Floyd was to receive as his compensation from Hoosier Pete, for the use of his equipment, a percentage of the established Interstate Commerce Commission freight rates, and that Hoosier Peter was to carry for Floyd's benefit public liability and property damage insurance on the tractors.

█ Floyd, in carrying out his arrangement with Hoosier Pete, hired, fired and disciplined his drivers, none of whom worked either full or part time for Hoosier Pete. Floyd received his hauling orders from Hoosier Pete but determined where his drivers were to obtain the material hauled, gave them trip assignments and determined what routes they were to follow in making deliveries. Floyd paid the drivers with his own personal checks, withheld tax deductions, made income, social security and unemployment tax payments on their behalf, filed the necessary federal and state reports and bore the expense of maintaining his tractors in good operating condition. While, as we have indicated, the issue is arguable, we are of the view that the facts amply support the Board's conclusion. See United States v. Silk, 331 U.S. 704, 719, 67 S.Ct. 1463, 91 L. Ed. 1757, and the decisions of this court, Williams v. United States, 7 Cir., 126 F.2d 129, 132–133; Greyvan Lines, Inc. v. Harrison, 7 Cir., 156 F.2d 412, 415, and National Labor Relations Board v. Phoenix Mut. Life Ins. Co., 7 Cir., 167 F.2d 983, 986, 6 A.L.R.2d 408.

In this connection, it is significant, as subsequently noted, that the union demanded of Floyd that it be recognized as the bargaining representative of his employees. Furthermore, the picketing, at least so it is now claimed, was directed solely at Floyd. Thus the conduct of the union and its members was inconsistent with the theory now advanced, that is, that Floyd was something other than an independent contractor.

There is no dispute but that Floyd maintained a regular place of business at Hoosier Pete's filling station, although he maintained an office with his equipment and records at his home where his clerical work was performed by his wife. Floyd's tractors and the trailers which he hauled were parked, when not in use, on a portion of the filling station lot designated as a parking area. On November 17, 1952, the union business agents informed Floyd that the union represented a majority of his drivers and demanded that he recognize it as their collective bargaining representative. This request was denied by Floyd. On November 18, 1952, the union started to picket the station. The pickets carried signs bearing the legend, "On Strike," in black bold faced printed type. Underneath, and printed by hand on one line was the name "Jesse Floyd." Below this line were the words "Haulers For," and on the next line in large letters was the name "Hoosier Pete." In the course of the picketing the pickets held up the picket signs, gestured and shouted to truck drivers entering the filling station and to drivers standing at the fuel pumps, none of whom was there for the purpose of doing business with Floyd, that the station was unfair to organized labor and that the "station was on strike." They stopped trucks about to enter the station, climbed on their fenders and told the drivers that the station was unfair and on strike. Finally, they threatened truck drivers with having their union cards "pulled," i. e., revoked, if they "gassed up" at the station. As a result, many drivers who approached or entered the filling station drove off, or through it, without trans-

acting the business which brought them there. On one occasion the pickets dissuaded a truck driver employed by a supplier of Hoosier Pete from unloading oil at Hoosier Pete's bulk plant. The pickets attempted to stop the driver as he passed the picket line in front of the station. They were unsuccessful but pursued the driver into the parking area where they had a conversation with him, after which he recoupled his trailer and left without unloading his cargo.

■ A few days after the picketing commenced, Floyd removed his trucks from the parking place theretofore occupied by them and thereafter appeared at Station No. 7 only for the purpose of making deliveries or being serviced. Several days later, when the union learned of this action on the part of Floyd, the pickets were removed. The Board reasoned, and not without a substantial basis, that Hoosier Pete was a neutral party, although the proof is substantial that the strike was directed against it as much as it was against Floyd. In other words, the union made no distinction in its picketing activities between Hoosier Pete and Floyd; they were directed at both. There may be situations where the secondary employer (here Hoosier Pete) must suffer some of the consequences of the picketing of the primary employer (here Floyd), but we agree with the Board that the present case does not come within that category. Not only the banners which the picketers displayed but their activities and conduct toward the employees and customers of Hoosier Pete demonstrate that as to it the strike with the resultant picketing was a secondary boycott and unlawful under the Act. The facts bring the case within the reasoning of the Board in the Moore Drydock Co. case, 92 N.L.R.B. No. 547, as applied and interpreted by the second Circuit in National Labor Relations Board v. Service Trade Chauffeurs, 191 F.2d 65, 68.

The Board's petition for enforcement of its order is allowed.