NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 135, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, Respondent.

No. 12541.

United States Court of Appeals Seventh Circuit.

June 17, 1959.

Rehearing Denied July 22, 1959.

Thomas J. McDermott, Associate Gen. Counsel, Melvin Pollack, Atty., Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Edward J. Fillenwarth, Indianapolis, Ind., Gregg, Fillion, Fillenwarth & Hughes, Indianapolis, Ind., of counsel, for respondent.

Before MAJOR, HASTINGS and KNOCH, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon the petition of the National Labor Relations Board for enforcement of its order issued against respondent Union on March 14, 1957, pursuant to Sec. 10(c) of the National Labor Relations Act as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.). This court has jurisdiction under Sec. 10 (e) of the Act, the unfair labor practices found by the Board having occurred in Indianapolis, Indiana, within this judicial circuit. The Board's findings of fact, conclusions of law and order are reported at 117 N.L.R.B. 635. The Board found that the Union violated Sec. 8(b) (4) (A) and (B) of the Act by inducing and encouraging the employees of concerns doing business with Capital Paper Company and Consolidated Sales, Inc. (herein jointly referred to as Capital), not to handle Capital freight, with the objective of disrupting Capital's business relations with these concerns and of forcing Capital to deal with the Union as the collective bargaining representative of its employees, even though it had not been certified by the Board.

The two concerns jointly referred to as Capital constitute a unified enterprise engaged in the wholesale distribution of paper products, building materials, appliances and other items. Their purchases and sales in interstate commerce are substantial. Thus, no jurisdictional issue is presented.

The contested issues are two: (1) whether the Board properly found that the Union was responsible for stewards as agents of the Union, and (2) whether the Board's order properly enjoins the Union from violating Sec. 8(b) (4) (A) and (B), not only as to Capital but as to all other employers. Relative to the first issue, respondent urges that the stewards were not its agents, that it was not responsible for their conduct and activities and, predicated upon this contention, that testimony of statements made by such stewards was hearsay and therefore improperly admitted by the Trial Examiner.

A detailed statement or analysis of the evidentiary facts relied upon by the Board in support of its decision would unduly prolong this opinion and, in our judgment, would serve no useful purpose. A careful study of the evidence, oral and documentary, is convincing that the Board's findings are supported and that its order is proper and should be enforced. We shall, therefore, attempt to limit our discussion to some of the more salient aspects of the situation.

In December, 1955, respondent began an organizational campaign among the employees of Capital. On December 16, it requested recognition. This was denied by Capital and, on December 19, the Union filed a representation petition with the Board on which a hearing was held January 10, 1956. On February 13, the Union established a picket line at the premises of Capital. On the following day, the Board issued its Decision and Direction of Election in the representation case. On February 23, respondent sought to withdraw its representation petition, which request the Board denied by an order dated February 29. On the same day, Capital filed the charge upon which the complaint in the present proceeding is based. On April 13, the Unit-

ed States District Court for the Southern District of Indiana entered an order enjoining respondent from engaging in conduct violative of Sec. 8(a) (4) (A) and (B) of the Act, pending adjudication before the Board. At the time of the hearing before the Trial Examiner, respondent was still picketing the premises of Capital.[1]

Swiftly following the establishment of the picket line at the premises of Capital, a series of events occurred which in the main constitute the basis for the unfair labor practices with which respondent is charged. In summary, these events consisted of a refusal on the part of the stewards and other employees of five named secondary employers, all customers of Capital, to accept or unload goods and merchandise consigned to such secondary employers by Capital. The five named secondary employers are Allied Grocers, Southern Motor Express, Inc., McDaniel Freight Lines, Inc., Motor Freight Corporation and R. D. Motor Express Company. The employees of all of these secondary employers were members of respondent Union. Refusals to receive freight from Capital at the premises of each followed a same or similar pattern. They were made or participated in by stewards, assistant stewards and other employees. The reasons generally assigned for such refusals were that the shipments from Capital "had come through a picket line," were "unfair freight" and "hot goods." On several occasions a driver of a Capital truck would insist that the shipment should be accepted because there was no legal strike at Capital. Thereupon, a steward would telephone the Union hall (respondent's), where he was told that there was a strike and picket line at Capital. The refusal to accept a shipment followed. There was testimony by one witness that he was told by the dock employees at McDaniel Freight Lines that they refused to handle the freight "because the Union had advised them not to." On

cross-examination, however, this witness explained this testimony with the statement, "Being a former Union member I knew that in the contract there is a 'hot goods' clause that declares that 'unfair goods' does not have to be handled by the Union member."

A revealing incident is shown in connection with the refusal to receive Capital freight at the premises of R. D. Motor Express Company. There, employee Ervin called the Union hall to ascertain if there was a strike at Capital. Immediately afterward he stated, "I can't handle that. * * * I might get hell if I did or if I don't." In response to an inquiry by a representative of management as to why the shipment would not be accepted, Ervin stated, "Well, I just called the hall, and he said it was 'hot goods.'" At that time Ervin signed the following statement, "This is to certify that Capital Paper Co. offered shipments this date for transport to Muncie and Anderson, Indiana and shipments were refused at this dock due to the fact that Capital Paper is on strike. Union Hall was called and approval given to refusal." Respondent's officials, including its president, when advised of the written statement which Ervin had made, became much concerned. They demanded its return and in order to obtain same went so far as to cause a work stoppage at the employer's plant.

From the circumstances related and others shown by the record, the Trial Examiner concluded that the stewards "were acting within the scope of their authority and that their conduct was likewise binding upon the Union." This conclusion of the Trial Examiner and his findings in its support were approved by the Board, and we think properly so.

Respondent, in contending that the stewards were not its agents or that it was not responsible for their activities, relies, erroneously we think, upon common law principles. Section 2(13) of the Act provides:

---

1. Only 17 of the 67 employees of Capital joined in the strike called by respondent and, in an election subsequently held by the Board, respondent lost by a vote of 4 to 39.

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

In N. L. R. B. v. International Brotherhood of Teamsters, etc., 2 Cir., 228 F.2d 83, 84, the court in discussing a similar situation stated:

" * * * there is substantial evidence to support the findings of the Board, [citing case] that Parks was acting with the knowledge and acquiescence of the Union and that he had implied authority to do what he did."

See also N. L. R. B. v. Acme Mattress Co., Inc., 7 Cir., 192 F.2d 524, 528, and N. L. R. B. v. International Brotherhood of Teamsters, etc., 3 Cir., 249 F.2d 292.

Respondent, in denying responsibility for the acts of the stewards, places great reliance upon a decision of this court in N. L. R. B. v. P. R. Mallory & Co., Inc., et al., 7 Cir., 237 F.2d 437. It is true in that case we held that a minor group of stewards who led a movement to compel the discharge of an employee because of non-membership in the Union were not acting on behalf of the Union. Our conclusion was based largely on the undisputed fact that the stewards were acting contrary to Union policy and to the express directions which they had received from the Union. In contrast, the stewards in the instant situation were acting in conformity with the policy fixed and established by the Union.

Respondent Union had a contract with each of the secondary employers[2] which contained a so-called "hot cargo" clause. These agreements provided in part:

"It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. * * * The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm, or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from, or to make pickups from, or deliveries to establishments where picket lines, strikes, walkouts or lockouts exist."

Thus it appears that the Union by these agreements negotiated by it on behalf of its members definitely established a policy against the acceptance of "hot cargo" shipments. More than that, it seems that the Union is in a poor position to disclaim responsibility for the acts of its members authorized by an employment agreement entered into at the behest of the Union.

In the hearing before the Trial Examiner, these "hot cargo" agreements which the Union had with the secondary employers were strongly relied upon in defense of the unfair labor practices charged. In this connection it is significant that Board member Murdock dissented from the Decision and Order of the Board, not because respondent was not responsible for the acts of the stewards in refusing to accept shipments from Capital but solely on the ground that it was protected by reason of the "hot cargo" agreements with the secondary employers. He stated, "I believe that the Respondent could lawfully instruct its members to refrain from handling the Charging Party's freight." This defense, however, is no longer available to respondent by reason of the recent decision of the Supreme Court in Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186. In connection with this decision, it should be noted that in the instant case none of the secondary employers consented to the refusal of the stewards and other

---

2. Respondent's agreement with Allied Grocers was not offered in evidence.

Union members to accept shipments from Capital. On the other hand, they urged, without success, that the employees receive such shipments.

Our agreement with the Trial Examiner and the Board, that the stewards and other Union members in refusing to accept shipments from Capital were acting in conformity with Union policy and for and on its behalf, dissipates respondent's contention relative to the admission of hearsay testimony.

We agree with the Board's decision that the objective of respondent's conduct was to force the various secondary employers to cease doing business with Capital. More than that, in view of the circumstances relative to the representation proceedings initiated before the Board by respondent and the occurrences at the premises of Capital as heretofore set forth, we agree with the Board that another objective of respondent was to force Capital to recognize respondent as the bargaining agent for Capital's employees. This conclusion is a reasonable if not an inescapable inference from the circumstances related.

■ The Board directed respondent to cease and desist its unfair labor practices not only as to the employers directly involved in the instant proceeding but as to "any other employer." Respondent insists that such order is too broad and should be modified, based upon the premise that there was no proof of any unfair labor practice as to any other employer and that it offered to prove that many secondary employers continued doing business with Capital.

The Board's order followed the recommendations of the Trial Examiner. The latter in his report stated:

> "Having found that the Respondent has violated Section 8(b) (4) (A) and (B) of the Act, I shall recommend that it cease and desist therefrom and take certain affirmative action designed to effectuate the policies of the Act. In determining the scope of the recommended order it is relevant to note that in three other cases within the recent past the Board found that the Respondent here involved violated Section 8 (b) (4). Local Union No. 135, affiliated with International Brotherhood of Teamsters (Irvin J. Cooper, et al.), 101 NLRB 1284; Local Union No. 135, affiliated with International Brotherhood of Teamsters (Hoosier Petroleum Company, Inc.), 106 NLRB 629, enfd., 7 Cir., 212 F.2d 216 (C.A.7); Local Union No. 135, affiliated with International Brotherhood of Teamsters (Marsh Foodliners Inc.), 114 NLRB No. 108."

In N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381, the court stated:

> " * * * the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress."

In N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 436, 61 S.Ct. 693, 700, 85 L.Ed. 930, the court stated:

> "Having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts."

The Board is authorized to restrain other violations, the danger of whose commission in the future is to be anticipated from conduct in the past. N. L. R. B. v. United Mine Workers, 6 Cir., 195 F.2d 961, 963, and cases therein cited.

As pointed out by the Trial Examiner, this is not an isolated case so far as the Board is concerned. It has previously considered and decided that respondent committed the same or similar unfair labor practices. Respondent's request that the order be modified is denied.

The Board's petition for enforcement of its order is granted and a decree will be entered accordingly.