**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHAUFFEURS, TEAMSTERS & HELPERS LOCAL NO. 364, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Norman Murrin, Ernie Maahs and Mike Lawrence, Respondents.**

**No. 12654.**

United States Court of Appeals Seventh Circuit.

Jan. 5, 1960.

Thomas J. McDermott, Associate Gen. Counsel, Margaret M. Farmer, Atty. N. L. R. B., Washington, D. C., Ross M. Madden, N. L. R. B., Chicago, Ill., Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Attys., N. L. R. B., Washington, D. C., for petitioner.

David Leo Uelmen, David Previant, Milwaukee, Wis., for respondents, Goldberg, Previant & Cooper, Milwaukee, Wis., of counsel.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

The National Labor Relations Board, pursuant to Section 10(e), 29 U.S.C.A. § 160(e), of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.) seeks enforcement of its Order against the respondent Union, its agents and representatives, including the above named individual respondents, to cease and desist from engaging in, or encouraging the employees of any employer (other than the Light Company, the charging party before the Board) to engage in a strike or concerted refusal to perform services with the object of forcing any employer to refuse to do business with Light, and to require the posting of specified notices. The respondent Union is thus charged with secondary boycott activity in violation of Section 8(b) (4) (A) of the Act, 29 U.S.C.A. § 158(b) (4) (A), which provides that it shall be an unfair labor practice for a union or its agents to induce or encourage the employees of any employer to engage in a concerted refusal in the course of their employment to handle any goods where an object of such refusal is to require any employer to cease doing business with any other person.

The respondents state the issues to be:

"1. Whether the Board properly asserted jurisdiction in this case.

"2. Whether substantial evidence supports the Board's finding that Respondents engaged in an unlawful secondary boycott."

The background facts are not seriously in dispute. The case was submitted to the Board's trial examiner on a stipulated record. The Board found that when Light had ignored the Union's written demand for recognition as its employees' bargaining representative, the Union called a strike in December, 1956, and established a picket line at Light.

Light, the primary employer, operates a retail appliance store in South Bend, Indiana. In 1956, its sales to residents of Michigan amounted to $24,068.53.

The secondary employers involved are Modern Warehouse Corporation and its

wholly owned subsidiary Cartage, Inc., both of whom will be generally referred to hereinafter jointly as "Modern." Both are located in a warehouse in South Bend, Indiana. In 1956, their combined revenues for storing and handling goods shipped or to be shipped and handling and packing goods to be transported in interstate commerce was $96,995.88.

Light purchases General Electric products from GE Appliance Co., which are stored in Modern's warehouse. When a purchase is made GE gives Light an order on Modern to turn over the purchased merchandise. Modern's employees remove the merchandise from stock, carry it to the dock for loading, and help load it on the customer's conveyance.

■ Modern has a contract with the Union incorporating a so-called "hot cargo" clause which purports to relieve the Union and employees of the obligation of handling goods coming from or going to a struck employer. It is not urged in this Court that this clause constituted a defense to the charge, nor is such defense available. Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186.

The Board found that in December, 1956, after the strike had begun at Light, Ernest Maahs, a business agent for the Union, told Robert Mestach (then temporary warehouse foreman of Modern in the absence of William Hosler) that the men were not to load merchandise for Light. In January, 1957, Light's president, Herman Light, presented a GE order to Mestach, who asked the employees if they wanted to load for Light. They refused on the ground that Light was not "off strike" yet. Herman Light then took his order to Arthur Demby, Modern's president. Norman C. Murrin, president of the Union, was with Demby at the time. When asked by Demby whether the merchandise might be handed over, Murrin replied, "Absolutely not * * * Light's on Strike."

Light sued out a writ of replevin, which the sheriff and his deputy presented to Demby. The same afternoon, Herman Light returned with a truck driven by one of his own employees. A striking employee of Light, waiting in a parked automobile, got out and marched around the truck with a picket sign identical to that used in the picket line at Light.

Demby asked two of his employees to load the merchandise for Light. They refused. Another business agent of the Union, Steve Kern, told one of these two employees that "The guys shouldn't work behind the picket line." Demby then told the two that they "might as well punch out." They and Mestach left, but waited outside until the Light truck left. Demby himself, over Kern's objections, undertook to operate the forklift to bring the merchandise down. Herman Light and his employee loaded their truck and departed. The picket left. On a signal from Kern, the three Modern employees returned.

The Board further found that sometime on or about April 24, 1957, the Union made union stewards of all Modern's warehouse employees and instructed them not to load any dealer's truck unless the driver showed a union card. This created a general hardship. Demby posted a notice to move all merchandise without discrimination. Union President Murrin then lifted the restriction on all dealers except Light. William Hosler, whom Mestach had temporarily succeeded as warehouse foreman, returned and took over his old job. He testified that Union Agent Maahs instructed the men not to handle Light's merchandise nor to show Herman Light where that merchandise was. Hosler had asked Maahs, "What happens if I get the stuff myself", if others refused, and was told, "You know better than that." May 3, 1957, Herman Light called in vain for his firm's merchandise. May 6, 1957, Demby posted another notice instructing Modern's employees to move Light's merchandise. Mestach, now a new Un-

ion Steward, telephoned Murrin, who told him Light as yet had no contract with the Union. Mestach testified that Murrin made it explicit that no loading was to be done for Light. May 20th, the Union wrote Demby demanding that the notice posted May 6th be rescinded. May 27th Maahs threatened to close the Modern plant. He did take the men off the dock, but when Demby agreed to recall the notice, Maahs signalled the men to return. Light made no further efforts to obtain merchandise at Modern.

 The evidence supports the Board's finding that Modern's employees, under orders of Union officials, concertedly refused to perform their accustomed services with the object of forcing Modern to discontinue dealing with Light, in violation of Section 8(b) (4) (A). The Union argues that the evidence demonstrates that Modern's employees on their own initiative refused to assist Light while it was engaged in a labor dispute. We cannot agree. Besides the inclusion of the "hot cargo" clause in agreements negotiated by the Union on behalf of its members established a policy against handling "hot cargo" merchandise. N. L. R. B. v. Local 135, International Brotherhood of Teamsters, etc., 7 Cir., 1959, 267 F.2d 870, certiorari denied 80 S.Ct. 258. In that case, Judge Major, speaking for this Court, said (267 F.2d at page 873):

> " * * * it seems that the Union is in a poor position to disclaim responsibility for the acts of its members authorized by an employment agreement entered into at the behest of the Union."

As in the case of Local 135, supra, the secondary employer did not consent to the refusal of its employees to handle the primary employer's merchandise. Demby made repeated, though unsuccessful, attempts to induce his employees to handle Light's merchandise.

 Even where the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction, the Board may decline to do so, stating that policies of the Act would not be effectuated by its assertion of jurisdiction in that particular case. N. L. R. B. v. Denver Bldg. & Construction Trades Council, 1951, 341 U.S. 675, 684, 71 S. Ct. 943, 95 L.Ed. 1284. In a series of cases, the Board has classified numerous industries by the kind of commerce involved and has laid down a minimum annual dollar amount.

The trial examiner concluded that the unfair labor practices affected commerce within the meaning of the Act so that the Board had jurisdiction under the powers granted to it by the Act, but that the extent to which the unfair labor practices affected commerce was not substantial enough and their impact upon the flow of commerce was not sufficiently pronounced to warrant assertion of jurisdiction. He reasoned that Light's direct sales of $24,000 did not meet the Board's self-imposed limit of $100,000 for exercise of its jurisdiction in respect to owners of a single retail establishment, Hogue & Knott Supermarkets, 110 N.L. R.B. 543, 544 (1954). He found that Modern alone also failed to meet the standard, as a minimum annual revenue of $100,000 had been prescribed for its type of business. Jonesboro Grain Drying Co-op., 110 N.L.R.B. 481, 484 (1954). The trial examiner also concluded that under Jonesboro (page 484), the two standards might not be combined. Jonesboro announced discontinuance of the so-called "combination category" of the 1950 plan, (page 487) or combined percentage practice, which is not involved here. Under that practice, the primary employer's operations were computed at X% and the secondary employer's operations at Y% of the respective applicable standards. If X and Y totalled 100% or more, then the Board would assert jurisdiction.

 There is no question that either Light or Modern considered separately "affected commerce" within the meaning of the Act. Joliet Contractors Ass'n v. N. L. R. B., 7 Cir., 1952, 193 F. 2d 833, 841–842, and cases therein cited. Respondents contend that the policy con-

siderations, which have led the Board to set limits on the exercise of its own jurisdiction, dictated dismissal of this case. The Board, however, argues that whether or not the Board will exercise its jurisdiction is a matter of administrative policy which the Courts will not review. Local Union No. 12, Progressive Mine Workers, etc. v. N. L. R. B., 7 Cir., 1951, 189 F.2d 1, 5, certiorari denied 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653. In any event, the Board concluded that in secondary boycott cases, it is the total impact on commerce which is significant, and that the Board properly added the $24,000 direct interstate business of Light, the primary employer, to the $96,-000 indirect interstate storage and cartage business of Modern, the secondary employer, to meet the Board's own administrative standard of $100,000. Joliet Contractors Ass'n v. N. L. R. B., supra, 193 F.2d 839, 840. The policy standards of the Board do not limit the jurisdiction conferred on it by Congress. N. L. R. B. v. W. B. Jones Lumber Co., 9 Cir., 1957, 245 F.2d 388, 391.

■ Unlike procedural rules in cases cited by respondents (N. L. R. B. v. United Brotherhood of Carpenters, 7 Cir., 1958, 261 F.2d 166; Madden v. International Organization of Masters & Pilots, Inc., 7 Cir., 1958, 259 F.2d 297) the Board's jurisdictional standards do not implement specific statutory requirements. N. L. R. B. v. Guy F. Atkinson Co., 9 Cir., 1952, 195 F.2d 141, also cited by respondents, is distinguished from the case before us in that it involved retroactive application of a jurisdictional standard.

A construction employee had been discharged for failure to maintain his membership in a union with which the employer had a closed shop contract. The contract was executed prior to the effective date of the Labor Management Relations Act of 1947, and hence was a valid defense to the charge of wrongful discharge if it had been made with the representative of the employees in the appropriate collective bargaining unit. Throughout the pertinent period, the Board had refused to take jurisdiction where the construction industry was involved, a fact which the Ninth Circuit found to be "notorious." The Board subsequently did take jurisdiction. The Board found that the contract was not made with the representative of the employees in the appropriate collective bargaining unit, etc., and directed reinstatement of the employee. The Ninth Circuit in denying enforcement of that part of the Board's Order, spoke (195 F.2d at page 149) of the inequity of such an impact of retroactive policy-making upon the employer, innocent of any conscious violation of the Act and unable to know, when it acted, that it was guilty. The Order in that respect was set aside as "arbitrary, capricious, and an abuse of discretion." That is not the case before us here.

■ When determining whether it will effectuate the policies of the Act to assert jurisdiction in a secondary boycott the Board must consider the fact that a secondary boycott extends beyond the operations of a primary employer to those of secondary employers. Jamestown Builders Exchange, Inc., 93 N.L.R.B. 386 (1951). Thus the Board has asserted jurisdiction where the business of either primary or secondary employers alone, McAllister Transfer, Inc., 110 N.L.R.B. 1769 (1954); Euclid Foods, Inc., 118 N.L.R.B. 130 (1957); or both employers together meet the applicable standard. Reilly Cartage Co., 110 N.L.R.B. 1742, 1744 (1954); W. H. Arthur Co., 115 N.L.R.B. 1137, note 2 (1956).

■ Direct out-of-state sales have an impact on commerce at least equal to an equal amount of sales within the state to concerns engaged in interstate commerce. Pacific Fine Arts, 116 N.L.R.B. 1607, 1608. Similarly, direct outflow of goods has as great an impact on interstate commerce as an equal amount of indirect outflow of services.

■ Respondents consider the proceeding a nullity because the charge was filed by Light, the primary employer, who was engaged in the labor dispute,

and was not an "innocent third party." The Act does not place such restrictions on the charging party, but provides, Section 10(b), "Whenever it is charged," the Board shall have power to investigate, etc. Anyone may file a charge. N. L. R. B. v. Indiana & Michigan Electric Co., 1943, 318 U.S. 9, 18, 63 S.Ct. 394, 87 L.Ed. 579.

In oral argument, respondents emphasized their contention that they had already complied with the Order. The Board disputes that contention. However, even assuming compliance, the Board is not therefore disentitled to a decree barring resumption of the illegal conduct. N. L. R. B. v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 826, 94 L.Ed. 1067.

The Board's petition for a decree enforcing its order is granted.