276 F.2d 694
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, and its agent, J. Earl Welch; Local 347, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; Local 269, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; and Local 505, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Respondents.
 No. 12800.
 United States Court of Appeals Seventh Circuit.
 March 22, 1960.
 
 Stuart Rothman, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Frederick U. Reel, George Schatzki, Melvin Pollack, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.
 Harold G. Talley, Alton, Ill., Francis X. Ward, William A. McGowan, Indianapolis, Ind., for respondents.
 Before DUFFY and SCHNACKENBERG, Circuit Judges, and STECKLER, District Judge.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 The National Labor Relations Board asks us to enforce an order which it issued on June 26, 1959[1] against the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, and its agent, J. Earl Welch; Local 347, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; Local 269, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; and Local 505, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, pursuant to § 10(e) of the National Labor Relations Act, as amended. 29 U.S.C.A. § 160(e).
 
 
 2
 Midwest Homes, Inc., an Illinois corporation,[2] manufactures prefabricated homes, in the erection of which it uses some window units produced and supplied by the Andersen Corporation, whose employees are not represented by any labor organization. Midwest's carpenter employees are members of respondent Local 347. When erecting homes outside the jurisdiction of Local 347, its employees get work permits from the local union having jurisdiction. These permits and their use are provided for by the bylaws of the local unions and are protected by the constitution and bylaws of the several respondents. From 1952 until June 4, 1958, Midwest had displayed respondents' union label on products manufactured in its plant.
 
 
 3
 Midwest was authorized to and did use the labor of members of respondents on products not manufactured in its plant until June 4, 1958, when J. Earl Welch, respondent, who was a general representative of the Brotherhood, and business agent Jesse P. Kingery, of Local 347, informed Midwest's president that the label was to be taken away because of the use of Andersen windows. This was done when the president stated that he had no intention of ceasing to do business with Andersen. Shortly thereafter, Kingery said to the company president, "Why don't you go along with Mr. Welch and get rid of those windows and let's all get along peacefully?"
 
 
 4
 On several occasions during the month of July, 1958, attempts were made by employees of Midwest to erect houses in Illinois, but business agents of respondents refused to authorize the issuance of permits and caused union members to refuse to work for Midwest. A charge was filed on July 18, 1958, with the Board. An amended charge was filed on July 30, 1958, reading:
 
 
 5
 On or about July 17 and 18, 1958, and at various other times, the said Labor Organization and their agent Welch induced and encouraged employees of Midwest Homes, Inc., Mattoon, Ill., to refuse to work or handle goods or to perform services with objects of forcing and requiring the said Employer to cease doing business with Anderson [sic] Corporation, Bayport, Minn., and to cease using or otherwise dealing in the products of the said Anderson [sic] Corporation.
 
 
 6
 At the same time a complaint was filed, naming Midwest as the charging party and the respondents therein as shown in the caption of this opinion. No other parties were named in the complaint.
 
 
 7
 Following a hearing before a trial examiner, who filed an Intermediate Report, the Board entered the order which it now asks us to enforce. The order directs that respondents —
 
 
 8
 Cease and desist from engaging in a strike, or refusing to issue work permits or introductory slips to employees, or applying the constitution of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, or the bylaws of the Respondent Locals, or engaging in other conduct to induce and encourage the employees of Midwest Homes, Inc., or of any other employer to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, transport or otherwise handle or work on any goods, articles, materials or commodities or to perform any services for their employer, where an object thereof is to force or require Midwest Homes, Inc., or any other employer, to cease using or dealing in the products of, or to cease doing business with Andersen Corporation, or any other producer, processor or manufacturer whose products do not bear the Union label issued by United Brotherhood of Carpenters and Joiners of America, AFL-CIO. (Emphasis supplied.)
 
 
 9
 The italicized language was inserted by the Board and was not suggested by the trial examiner, who rejected the proposal when it was made by general counsel for the Board in the form of an exception to the Intermediate Report.
 
 
 10
 Counsel for the respondents now concentrate their attack in the case before us on the italicized language.[3]
 
 
 11
 The facts establish that respondents induced Midwest's employees to engage in a concerted refusal to work and that respondents' object was to force Midwest to cease using Andersen products. This is the kind of activity which Congress proscribed by § 8(b) (4) (A) of the National Labor Relations Act, as amended,[4] and the part of the cease and desist order not in italics, as above set forth, is limited accordingly. However, the Board, evidently as a basis for including the italicized language, found "* * * that Respondents' unlawful conduct herein was not directed exclusively against Andersen Corporation products but was rather against nonunion or unlabeled material regardless of origin." The Board also recited in its decision:
 
 
 12
 "The record also indicates that Respondents' conduct was in furtherance of the International's general policy to discourage the use of unlabeled products regardless of source. Accordingly, we shall modify the Trial Examiner's Recommended Order so as to enjoin Respondents from engaging in the prohibited conduct where an object involves any employer not permitted to use the union label."
 
 
 13
 An examination of the proceedings before the Board demonstrates that, in the part of the order now under attack, it attempted to adjudicate upon a case which, first, was never presented to it for decision, and secondly, was an abstract case. See Times Film Corp. v. City of Chicago, 7 Cir., 272 F.2d 90.
 
 
 14
 The scope of the proceedings before the Board was delineated by the amended charge and the complaint, both of which were limited to acts and conduct of the respondents inducing and encouraging employees of Midwest and other employers to engage in strikes or concerted refusals to handle materials and perform services for Midwest, an object thereof being to force Midwest and other employers to cease handling Andersen products. That is the only object stated.
 
 
 15
 The purpose of the proceeding was thus definitely to protect the products of Andersen from the unfair labor practices charged in the complaint.
 
 
 16
 That was the case which was presented and tried before the hearing examiner and brought before the Board upon his Intermediate Report. At that late stage the Board acceded to the importunity of its general counsel and introduced the new matter in the italicized portion of the order. That language clearly has no reference to Andersen but deals with any other producer, processor or manufacturer, whose products do not bear respondents' label. These strangers to the proceeding are not involved in the issue upon which the case was tried and their rights were not adjudicated therein. N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930. International Brotherhood of Teamsters, etc. v. N. L. R. B., 104 U.S.App.D.C. 359, 262 F.2d 456, 462. The distinction between the case involving the use of Andersen products, on the one hand, and a case dealing with the products of other producers, as a class, on the other hand, may be recognized by reading International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. The Electrical Workers Union objected to the breadth of the Board's order, and the court stated, 341 U.S. at page 705, 71 S.Ct. at page 960:
 
 
 17
 "* * * They contend that its language prohibits inducement not only of employees of Deltorto but also the inducement of employees of any other employer to strike, where an object thereof is to force Giorgi or any other employer or person to cease doing business with Langer. To confine the order solely to secondary pressure through Giorgi or Deltorto would leave Langer and other employers who do business with him exposed to the same type of pressure through other comparable channels. The order properly enjoins petitioners from exerting this pressure upon Langer, through other employers, as well as through Giorgi and Deltorto. We may well apply here the principle stated in International Salt Co. v. United States, 332 U.S. 392, 400 [68 S.Ct. 12, 17, 92 L.Ed. 20]: `When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.'" (Emphasis supplied.)
 
 
 18
 In upholding the order in that case, the emphasis of the court was placed upon the fact that it enjoined the union petitioners from exerting pressure upon Langer (a nonunion electrical subcontractor), through other employers, as well as through Giorgi (the general contractor) and Deltorto (a carpenter subcontractor).
 
 
 19
 This court in N. L. R. B. v. Local 135, International Brotherhood of Teamsters, etc., 267 F.2d 870, 874, recognized that, having found the acts which constitute an unfair labor practice, the Board is free to restrain the practice and other like or related unlawful acts, and cited N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930. In that case it appeared, at 874, that in three other cases which the Board had recently had before it involving the same local union, it had found violations of § 8(b) (4) involving three other named primary employers.[5] There is no such showing in the case at bar. We point out also that in N. L. R. B. v. Local 135, while the complaint before the Board did not allege the prior violations, no point was made in regard thereto in this court.
 
 
 20
 In the case at bar the order, so far as it is not italicized, falls within the sanction of the Electrical Workers case. Insofar as the italicized portion is concerned, it is unauthorized and improper.
 
 
 21
 Counsel have expressed some concern about some language used in Cosentino v. United Brotherhood of Carpenters, etc., 265 F.2d 327, 331, where we affirmed the issuance of a temporary injunction in this same case, pending final disposition of the proceedings before the Board. However, we were there dealing only with the propriety of the action of the district court in issuing a temporary injunction, the object of which was to preserve the status quo, pending a final hearing and the granting or denial of a permanent cease and desist order by the Board. The solution of the problem then confronting us was to determine whether the district court acted properly within the exercise of its discretion and whether there was a prima facie showing that plaintiff had a meritorious cause of action. 43 C.J.S. Injunctions § 200, p. 925. Whatever we said bearing upon these questions was important only as it bore upon the right of plaintiff to a temporary injunction. Whatever the district court in issuing the temporary injunction found or said and whatever on appeal from its order we said, lacked finality and was inconclusive when, upon a final hearing, permanent relief was granted. If we said anything upon the appeal from the order for a temporary injunction which may be interpreted as inconsistent with our views expressed in this proceeding to enforce the permanent cease and desist order of the Board, our present views must prevail. This is especially true in view of the fact that all subsequent proceedings took place before the Board and no final determination as to permanent relief was made by the district court.
 
 
 22
 In reviewing upon appeal the granting of a temporary injunction under § 10(l) of the Act, we were limited as emphasized in American Federation of Radio and Television Artists, etc. v. Getreu, 6 Cir., 258 F.2d 698, 699, by Judge Stewart (now Justice Stewart):
 
 
 23
 "At the outset we emphasize the limited scope of our function on this appeal. Section 10(l) of the Act requires that the district judge, as a prerequisite for the issuance of a temporary injunction, need only find that there is reasonable cause to believe that a violation of § 8(b) (4) (A) of the Act, as charged has been committed. * * * Resolution of the actual merits of the controversy is left for administrative determination by the Board, subject to subsequent review here in the event enforcement is sought." (Emphasis supplied.)
 
 
 24
 As we said in Madden v. International Organization, etc., 259 F.2d 312, 313:
 
 
 25
 "* * * Clearly a district judge proceeding under § 10(l), as here, looks to the statutory yardstick of `reasonable cause' required as the basis for the petition and he is certainly not deciding which party, petitioner or respondent, is ultimately to prevail, nor do we now. In this incipient stage the district court was asked to aid the Board by preserving the status quo until it could ascertain by hearings, whether it had statutory jurisdiction, and if unfair labor practices existed. * * *"
 
 
 26
 Whether at some time in the future respondents will be guilty of an unfair labor practice under § 8(b) (4) (A) in inducing employees of Midwest or any other employer to engage in a strike or a concerted refusal to work where an object thereof is to force or require said Midwest or other employer to cease using or dealing in products of, or to cease doing business with, any producer, processor or manufacturer, other than Andersen, whose products do not bear the union label of respondents, cannot be ascertained until the time arrives when all of the elements necessary to constitute such a violation have occurred. It may well be that such a charge, when made, cannot be proved. For instance, the secondary employer might act voluntarily and not be coerced, as contemplated by § 8(b) (4) (A). That would not be an unlawful secondary boycott. See Local 1976, United Brotherhood of Carpenters and Joiners of America, A. F. L. v. N. L. R. B., 357 U.S. 93, 98, 78 S.Ct. 1011, 2 L.Ed.2d 1186. The Board had no right to issue a cease and desist order to apply to mere future contingencies in the unwarranted belief that any secondary boycott that might occur would entitle the affected manufacturer, processor or producer to relief under § 8(b) (4) (A).
 
 
 27
 In the case at bar, the Board had the facts involved in the pending charge of secondary boycott against Andersen before it and was able to adjudicate thereon. However, when it purported to grant relief in cases of secondary boycotts against others than Andersen before those cases arose (if ever), the Board lacked sufficient facts upon which to act. Consequently, in effect it merely announced a legal pattern, commanded "Go and sin no more" and then washed its hands of the matter. The effect of its argument here is that, in asking us to enforce its order, it would impose upon a court of appeals, on a possible future hearing of contempt charges, the duty of resolving factual issues as to whether an illegal secondary boycott has been committed against a particular primary employer not named in the present proceeding. This duty we should not undertake because, first, that determination should be made by the Board before it enters its order, and secondly, we do not believe it was the intent of congress that courts of appeal should be so used in enforcement proceedings to remedy deficiencies in the orders sought to be enforced.
 
 
 28
 We agree with what was said in N. L. R. B. v. Local 926, etc., 5 Cir., 267 F.2d 418, where an order was entered by the Board that a union cease and desist from causing a secondary boycott aimed at Columbus Construction Company or "any other employer or person". The court, at page 421, said: "* * * There is nothing in the record to justify any such broad coverage. * * *
 
 
 29
 "We are aware of the considerations supporting a broad grant of discretion to the Board in determining the proper remedy for a violation of the Act. We consider more important, and basic to a fair administration of the Act, the hard-won principle of Anglo-American law that a judgment or order must find adequate support in the record. An order of a court or federal agency that goes beyond the record to penalize an offender as a bad actor smacks too much of attainder to be acceptable to this Court. We are committed to a narrower view of the proper scope of orders that may furnish the basis for contempt proceedings." (Citing cases.)
 
 
 30
 For the reasons set forth above, we hold that the language which has been italicized in the Board's order of June 26, 1959 must be stricken therefrom and that a decree be entered herein modifying said order in that respect and enforcing it as so modified.
 
 
 31
 Order modified and enforced.
 
 
 
 Notes:
 
 
 [1]
 123 N.L.R.B. No. 217
 
 
 [2]
 Herein referred to as Midwest
 
 
 [3]
 They define the contested issues:
 
 
 [1]
 Whether the Board's order insofar as it protects non-union primary producers other than Andersen is valid and proper
 
 
 [2]
 Whether, as a matter of law, § 8(b) (4) (A) of the Act affords a blanket protection to all non-union producers and to their unlabeled products and will support a § 10(c) order granting such blanket protection
 
 
 [3]
 Whether, as a matter of law, the policy of a Union to discourage the use of non-union unlabeled products regardless of source standing alone is a violation of § 8(b) (4) (A) which may be enjoined by a blanket § 10(c) order
 
 
 [4]
 29 U.S.C.A. § 158(b) (4) (A)
 
 
 [5]
 101 NLRB 1284; 106 NLRB 629, enforced N.L.R.B. v. Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 135, 7 Cir., 212 F.2d 216; 114 NLRB 639
 
 
 
 32
 DUFFY, Circuit Judge (concurring in part and dissenting in part).
 
 
 33
 I agree that we should not enforce that part of the order of the Board which includes "or any other producer, processor or manufacturer whose products do not bear the Union Label issued by United Brotherhood of Carpenters and Joiners of America, AFL-CIO."
 
 
 34
 The complaint, even as belatedly amended, alleged a section 8(b) (4) (A) violation only as to Andersen, by the inducement and encouragement of employees of Midwest. The cease and desist order recommended by the trial examiner was limited to Andersen. Under the amended complaint and proof in this case, the Board erred in not limiting its 10(c) order to the secondary boycott as to Andersen.
 
 
 35
 If we were to sustain the Board's order as to "any other producer, processor or manufacturer whose products do not bear the Union label * * *" we are opening a road which would be beset with great difficulties. Such a procedure might well impose on this Court the duty of proceeding on contempt charges which, in turn, might involve the determination of factual issues. New and independent charges against other producers or manufacturers might be brought here under contempt citations. Our Court is not the place for such controversies to be brought in the first instance.
 
 
 36
 We decided against any such procedure in 1941 in Reliance Mfg. Co. v. N. L. R. B., 125 F.2d 311, 321. There the Board ordered the posting of notices in all plants of the employer although there were no charges of unfair practices as to three of them. The Board argued the unfair labor practice was system-wide and centrally directed and coordinated. This Court, relying heavily on N. L. R. B. v. Ford Motor Company, 5 Cir., 119 F.2d 326, refused to enforce the order as to plants where no unfair labor practices were charged.
 
 
 37
 In the Ford Motor case, the charges had to do with alleged unfair labor practices at the Dallas plant of Ford. The Board's order as to posting of notices, etc., applied generally to all plants. The Fifth Circuit enforced the order only as to the Dallas plant, holding that the Board did not acquire, under the National Labor Relations Act, a general supervisory jurisdiction over the employer to be enforced by contempt orders.
 
 
 38
 The Fifth Circuit has consistently followed the Ford decision. See N.L.R.B. v. Dallas General Drivers, etc., Local Union 745, 228 F.2d 702; Truck Drivers and Helpers Local Union No. 728, etc. v. N. L. R. B., 265 F.2d 439, and N. L. R. B. v. Local 926, International Union of Operating Engineers, 267 F.2d 418.
 
 
 39
 In International Brotherhood of Teamsters, etc. v. N. L. R. B., 104 U.S.App. D.C. 359, 262 F.2d 456, the District of Columbia Circuit restricted the order to the primary employers named in the Board's complaint. For a similar result, see N. L. R. B. v. Cleveland-Cliffs Iron Co., 6 Cir., 133 F.2d 295.
 
 
 40
 It seems to me this Court departed from our decision in Reliance when we decided N. L. R. B. v. Local 135, International Brotherhood of Teamsters, 267 F. 2d 870. It is at this point I differ with my colleagues on this panel. The opinion in the instant case seeks to distinguish Local 135 because the local union there involved had been before the Board in three previous proceedings.
 
 
 41
 I cannot draw this fine line of distinction. Suppose the Local had been before the Board in only one previous proceeding. Would that be a sufficient basis for the all-inclusive order entered in this case? In fact, in the case at bar, the Board seeks to justify its broad order by taking judicial notice of its own record by citing three United Brother-hood of Carpenter cases before the Board, as well as a United Brotherhood of Carpenter case in the Supreme Court, in each of which the affiliated locals engaged in secondary boycotts by pressuring their members to refuse to handle any non-union material.
 
 
 42
 In my judgment, the decision in the case at bar takes all vitality from our previous decision in the Local 135 case. I think we should frankly state that the doctrine announced in Local 135 is no longer controlling law in this Circuit.
 
 
 43
 When the case at bar was here before, Cosentino v. United Brotherhood of Carpenters, etc., 265 F.2d 327, it was not here on the merits. Under Section 10(l) of the National Labor Relations Act, the Board petitioned the District Court for a temporary injunction pending a hearing by the Board on the merits of the charge. After hearing, the District Court entered Findings of Fact and Conclusions of Law. The language we used in Cosentino was to demonstrate there was basis in the record for the trial court's Findings and Conclusions, and that there was no abuse of discretion. We did not attempt to pass upon the merits of the controversy.