**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**P. R. MALLORY & CO., Inc. and International Union of Electrical, Radio and Machine Workers, CIO, Local 1001, Respondents.**

**No. 11671.**

United States Court of Appeals Seventh Circuit.

Oct. 11, 1956.

David P. Findling, Associate Gen. Counsel, Owsley Vose, Atty., N. L. R. B., Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Myron S. Waks, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frederic D. Anderson, Earl C. Townsend, Jr., George J. Zazas, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for respondent, P. R. Mallory & Co., Inc.

Before MAJOR, FINNEGAN and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

This matter is here upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act as amended, Title 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondents, International Union of Electrical, Radio and Machine Workers, CIO, Local 1001 (hereinafter referred to as IUE), and P. R. Mallory & Co., Inc. (hereinafter referred to as the Company). The Board's decision and order are reported in 111 N.L.R.B. 38. Both respondents request that the order be set aside.

The Board found that IUE by engaging in work stoppages in support of its demand that the Company discharge Mayme Dietz, a non-member, in order to prevent her from displacing a junior IUE member in her department, violated Section 8(b) (2) and (1) (A) of the Act, and that the Company by acquiescing in IUE's demand, with knowledge of IUE's unlawful purpose, violated Section 8(a) (3) and (1) of the Act.

The unfair labor practices are predicated upon incidents which occurred on September 15 and 22, 1953, with the subsequent discharge of Dietz. The issue most strongly pressed here by both respondents is the lack of substantial evidence to support the Board's findings upon which its order rests. At this point, a brief statement of the factual situation will suffice.

Prior to November 1949, Local 1001, the collective bargaining representative for the Company's employees at Indianapolis, Indiana, was affiliated with the United Electrical, Radio and Machine Workers of America (hereinafter referred to as UE). At that time, members of the Local, numbering about 2,000 employees, voted to disaffiliate from UE and to affiliate with IUE, which was substituted for UE as the bargaining representative and continued as such to and including the events in controversy. A small group of employees, some eighteen in number, including Dietz, were opposed to the change of affiliation and were not offered membership in IUE. Dietz joined UE in January 1944, and in 1947 or 1948 served as a union steward for three or four months. This constituted her only activity in connection with UE. Dietz continued her employment with the Company until the time of her discharge in 1953. She made no effort to join IUE, except on one occasion when she visited the union office and inquired of Sullivan, president of IUE, as to why she had not been offered a membership application card. At that time she was informed by Sullivan that it was because of her association with one Jackson whom Sullivan considered a Communist, and that the members had disaffiliated with UE because it was con-

trolled by Communists. At the same time Sullivan assured her that she would be protected as a non-member under the Taft-Hartley Act. The Company, unaware of her non-membership, continued for a while to deduct IUE dues from her pay. Upon advice from IUE that she was not a member, the Company, in August 1950, returned to her money which it had collected since November 1949.

For some two years following the change in affiliation by Local 1001, Dietz continued undisturbed in her employment with the Company and became a senior employee in her department. In October 1951, the Company announced that it was necessary to lay off a number of employees, and the next day the employees in her department engaged in a work stoppage apparently for the reason that they were opposed to Dietz and other non-union members working while union members were being laid off. Union president Sullivan came to the plant, advised the employees that the work stoppage was unauthorized, in violation of their collective bargaining agreement, and that future recurrences would be their own responsibility. He succeeded in persuading the employees to return to work. Dietz was permitted to resume her work while forty other employees, both member and non-member, were laid off.

Again Dietz continued in her employment for another period of almost two years or until September 15, 1953, when the first of the incidents in controversy took place. During the period after the affiliation with IUE, almost four years, there is no proof that Dietz was active either for or against the union and there is no proof of any hostility or favoritism by the Company toward IUE or any other union or any of its employees. On September 15, 1953, Dietz, after having been absent for several months on account of illness, returned to work, when some controversy arose in her department relative to her seniority rights. Apparently, however, this was adjusted and she commenced work. After the lunch hour, however, a mass demonstration took place, participated in by more than two hundred employees, including a number of union stewards. Bert Whisler, superintendent of the division in which Dietz worked, attempted in vain to ascertain the reason for the trouble. He ordered the employees to return to work and threatened to stop their pay. The employees gave no heed to Whisler's warnings and the uprising continued. Dietz informed Whisler that she was afraid, and she was escorted by Company officials to Whisler's office for protection. The employees crowded about the outside of Whisler's office, banged on the door, stamped their feet and yelled, "Let's go get her and throw her out." Several telephone calls for help were made, without success, to the president and vice president of the Local. Thereupon, Alex Kertis, the Company's personnel manager, instructed Whisler to have Dietz removed from the area for her own safety. Dietz expressed fear of returning to the floor to get her coat and hat, and they were obtained by Homer Stull, her immediate supervisor. At that time Dietz was promised by Kertis that an investigation would be made and she would be notified when to return to work.

Kertis and other Company officials made an investigation, saw no reason why she should not return and she was requested to return to work on September 22, 1953. At that time Dietz reported she had received telephone messages indicating another demonstration would occur. Dietz returned as requested and Kertis for safety reasons assigned Al Huber, supervisor of plant security and safety, together with two of his guards, to protect her. Shortly after she returned, however, another demonstration, which could more appropriately be described as mob action, similar to that of the previous week took place. Again Dietz was removed from the area and advised by Company officials to go home, with the promise that she would be notified when to return. Subsequently, Dietz made frequent calls to the per-

sonnel office and was advised by Kertis on one occasion that he could not recall her, that the same thing would probably again occur and that her safety would be in jeopardy. Following the September 22 incident, Kertis conducted further investigations as to the work stoppages, with no conclusion as to the motivating cause, but never felt the time was appropriate when he could safely advise Dietz to return to work. Dietz obtained employment with the Naval Ordnance Plant, Indianapolis, about November 4, 1953. This fact was called to the attention of Kertis and he decided to treat her as "quit with notice" as of that date for record purposes. On the following December 24, Dietz was paid her interest in a profit sharing and retirement plan and shortly thereafter was requested to return her identification badge.

The Board in its complaint with reference to the respondent union charged: " * * * on or about September 15, 1953 and on or about September 22, 1953, by its officers and other agents, including Esther L. Davis, L. Dearing, Charles Doyle, Basil Fox, Robert J. Freeman, Cordella Mutchler, Grace Simmons, Charles L. Snodgrass and John M. Sullivan, restrained and coerced * * * Dietz, in the exercise of the rights guaranteed to her in Section 7 of the Act, by inducing and encouraging more than two hundred members of the Respondent Union, employed in the Vibrator Department in Plant No. 2 * * * to quit their work * * *, and to yell demands and threats that they would refuse to return to work unless the Respondent Company ejected Dietz and terminated her employment; all because of the former membership of Dietz in UE, her former adherence to and activity in behalf of UE, and the announced policy of the Respondent Union to require the Respondent Company to terminate the employment of Dietz and other former adherents of UE, and in order to discourage adherence to, membership and activity on behalf of UE, and in order to encourage membership in the Respondent Union." Further, the Board

charged: "Since on or about September 15, 1953, and September 22, 1953, and at all times thereafter, the Respondent Union, by its officers and agents, attempted to cause, caused, and is now causing the Respondent Company to discriminate against Dietz, as heretofore set forth in paragraph 5 above, in violation of Section 8(a) (3) of the Act."

The complaint as it relates to the Company charged that the "Company terminated the employment of Dietz, and since September 22, 1953, has failed and refused and does now fail and refuse to employ and reinstate Dietz because of the demands of the Respondent Union made on the Respondent Company * * *, and for the purpose of discouraging adherence to, membership in, and activity on behalf of UE, and for the purpose of encouraging membership in the Respondent Union," and that by reason of such acts "the Respondent Company has engaged in and is now engaging in unfair labor practices within the meaning of Section 8(a) (1) and 8(a) (3) of the Act."

We shall first consider the order as it relates to the respondent union. The intermediate report of the trial examiner comes close, in our view, to demolishing the Board's theory as embodied in its complaint. Particularly is this so on the charge that Dietz was discharged because of her former membership in UE or because of the announced policy of the respondent union to terminate the employment of Dietz and other former adherents of UE. In this respect the examiner found: "At this point it is appropriate to point out that Dietz admitted she ceased being a member of UE in November of 1949, and did not thereafter engage in any activities on its behalf. Further there is no evidence of any activity at the plant on behalf of the UE during the time in question. Again the record is totally inadequate to support the allegation of the complaint that the IUE caused or demanded the discharge of Dietz in accordance with its announced policy to require the Company to discharge former adherents of the UE

in order to discourage membership therein and to encourage membership in the IUE. The undersigned so concludes and finds."

Evidently the trial examiner recognized that the charge could not be sustained as alleged in the complaint, as is shown by his report wherein he poised the issue thus: "Did the IUE, through its agents, induce and encourage a large number of employees to engage in work stoppages the object thereof being to force the Company to discharge Dietz because of her nonmembership in the IUE in order to encourage membership in that organization?" The examiner found: "The undenied evidence adduced by the General Counsel clearly established that the work stoppages were instigated and directed by the department stewards, which stoppages were in violation of the existing agreement and for an unlawful purpose."

The Board before this Court, consistent with its decision, also urges responsibility of the union solely upon the premise that certain stewards who actively participated in the mass demonstrations of September 15 and 22 were doing so as agents of the union and were acting within the general scope of their authority. With this contention we do not agree.

In its brief the Board states: "Under the Act the general law of agency is applicable and a union is liable for acts of its agents whether or not expressly authorized or ratified so long as the union actually empowered the agent to represent it in the area in which the agent acted." Assuming this to be a correct statement of a general principle of law, we think it is of no benefit to the Board in the instant situation.

Assuming at present that a few of the stewards in the division where Dietz was employed were leaders in the mass movements which we have related and that their purpose was to obtain her discharge because of non-membership in the union, the decisive question is whether they in such capacity were agents of the union, that is, acting for and on its behalf. The

record not only fails to support such a result; it refutes it. Dietz, as previously noted, was informed by Sullivan, the president of the union, at the time she was denied membership that the Taft-Hartley Act would protect her in her employment. Also as previously noted, Sullivan at the time of the work stoppage in October 1951, informed the employees that such stoppage was unlawful and that any further occurrences would be on their own responsibility. Also as noted, the trial examiner found that there was no proof in support of the contention that the union had an announced policy to terminate the employment of Dietz and other non-union members. For some four years there had been no union activity in or about the plant, and during that period there had been no demand or request of any kind by an official of the union that any person be discharged because of non-membership.

■ More important, of course, is the precise status which the stewards occupied in relation to the union. At the time of the incidents in controversy there were more than two hundred stewards in the plant. The manner in which they were selected was provided in the union constitution as follows: "Chief Stewards or Stewards shall be elected by his or her line, group or department, for a term of one (1) year." The same document provided the manner for their removal as follows: "For the removal of a Chief Steward or Steward, any member in good standing may appear before the Executive Board of Local 1001 with a petition signed by 51% or more of members in good standing within a line, group or department at that time must show good reason for removal of such steward or chief steward, this decision to be passed upon by the Executive Board." Thus, the record plainly discloses that the stewards in the division in which Dietz was employed, as in all other divisions, were elected by the employees of each division. Any authority which they possessed with reference to employees was limited to those of the

division in which they were elected. Their tenure was dependent upon the wishes of the employees of the division inasmuch as a movement for their removal required the support of 51% of the employees thereof. These stewards were neither elected nor appointed by the union or its members generally and any voice which the union or the members generally had in their removal was limited to a situation where a request was made by a majority of the employees of a particular division. Stewards received from the union no compensation for their services. With no obligation on the part of the union to compensate, with no right to appoint or discharge and with very limited authority or control, we discern no basis for a ruling under the general law of agency that the stewards were agents of the union.

Cases cited by the Board in support of this union-agency theory are clearly distinguishable. In United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 746, in an action against a union for damages caused by a strike, it was held that a Field Representative was the agent of the union. Presumably, although the opinion does not so disclose, he was appointed and compensated by the union, with the right in it to discharge. In National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, 9 Cir., 210 F.2d 581, it was held that an international union was responsible for the acts of a local union where the latter acted within its delegated authority. In National Labor Relations Board v. United Brotherhood, etc., 10 Cir., 205 F.2d 515, the court in a Per Curiam opinion held, without relating the facts, that it was sufficiently shown that the union was responsible for the acts of the steward there involved. Reference, however, to the decision of the Board in that case, 100 N.L.R.B. 753, and particularly the report of the trial examiner, pages 761 and 762, completely dissipates any support which the Board professes to find in the opinion of the court. It is there shown that the person held to be an agent of the union was

a "job steward" and that he was acting in pursuance of a "settled union policy." In the instant case, as shown, the trial examiner found that there was no proof that the stewards acted pursuant to an announced union policy; in fact, as shown, they acted contrary to a known union policy. Other cases cited by the Board are equally barren of support.

Furthermore, we do not agree with the Board that the stewards in conducting the work stoppages were acting within the scope of their authority. By agreement with the Company, the union was precluded from authorizing a strike of any kind, "including a work stoppage." It is not discernible on what basis the stewards could have been acting within the scope of their authority so as to make the union responsible when the union itself was under obligation to forego such conduct. Moreover, as previously shown, the stewards had been admonished by Sullivan that the work stoppages were unlawful and that those who participated would be personally responsible.

■ It follows from what we have said that the Board's order as it relates to the respondent IUE should be set aside and its enforcement denied.

■ The trial examiner in his report stated the issue relative to the Company as follows: "Did the Company, being aware of the purpose of the stoppages, yield to the demands of the IUE and unlawfully discharge Dietz?" It is not discernible how we could answer this question in the affirmative in view of our holding that IUE made no demand for the discharge of Dietz and was not responsible for the acts and conduct of the employees in causing the work stoppages of September 15 and 22. The Board, however, in its decision stated: " * * * we conclude and find, in agreement with the Trial Examiner, that the illegal motivation behind the employees' determination to exclude Dietz from the plant was known to the Employer, and by acquiescing therein the Employer laid off and in effect discharged her in violation of Section 8(a) (3) and (1)." Even so, the Board's brief is permeated with the

thesis that the Company is responsible because it acquiesced in the illegal demand made by IUE. For instance, in the concluding portion of its argument it stated: "Under all the circumstances of the case the Board could reasonably conclude that the Company had knowledge of the illegal motivation behind the IUE's exclusion of Dietz from the plant." And again: "It follows that the Company, by acquiescing in the IUE's illegal demand, thereby violated Section 8(a) (3) and (1) of the Act, as the Board found."

True, the Board advances the theory, specifically urged in oral argument, that there is no reason to deny enforcement of the order against the Company even though it should be denied as to IUE. In other words, the validity of the order against the Company is not dependent upon the validity of the order against IUE. This argument, as we understand, is bottomed on the premise that the demonstrations against Dietz were unlawful and discriminatory, known by the Company to be such, and that her discharge under such circumstances constituted an unfair labor practice. We assume this is a sound premise for the purpose of the discussion to follow. The issue is whether the Company had knowledge that the employee demonstrations were to cause the discriminatory discharge of Dietz and if so, whether it acquiesced in the employees' demands for the purpose of discouraging or encouraging membership in a labor organization. It was incumbent upon the Board to prove the affirmative of this issue.

The Board in its decision stated: "We also find, in agreement with the Trial Examiner, that the facts of this case preponderate in favor of finding that the Employer was well aware of the reason for the employees' objection to Dietz. Although there is no direct evidence of such knowledge by the Employer, we believe that the following circumstances compel an inference of Employer awareness of the motive behind the stoppages * * *." (Then follows an enumeration of the circumstances relied upon by the Board, subsequently to be stated and discussed.) The Board might have added that each Company official who testified at the hearing clearly and positively stated that he had no knowledge concerning the purpose of the work stoppages or that Dietz was a non-member of the union. Kertis, the Company's manager and the person solely responsible for all decisions made and all actions taken by the Company in respect to Mayme Dietz, in addition to denying any knowledge on his part testified that he knew of no Company official who had such knowledge. The Board does not rely upon any inconsistencies or discrepancies in the testimony of Company officials of a lack of knowledge but upon circumstances which it contends give rise to an inference to the contrary.

■■■■ We have experienced much difficulty in reaching a conclusion as to whether the Board's finding on this issue of knowledge should be accepted. On the one hand, we recognize the rule that the Board is entitled to draw inferences from the facts which, if reasonable, are not to be set aside by a reviewing court. On the other hand, we are charged with the responsibility of determining if a finding is substantially supported when viewed in the light of the entire testimony, including that opposed to the Board's view. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. We think a superficial consideration only of the relevant circumstances might lead to the conclusion reached by the Board However, a careful study of the record, which we have made, leads to the belief that the Company's contention of lack of knowledge is, under the circumstances, both reasonable and logical. In evaluating its contention, the circumstances leading up to and surrounding the activities in controversy as well as the environment in which the parties acted are highly important. There is no contention and not a scintilla of proof of any friction between the Company and IUE or any other union, or any proof of hostility or favoritism by the Company toward any union or any employee because of mem-

bership or non-membership in the union. In fact, the proof clearly demonstrates a relation between the Company and IUE that was amiable and cooperative. There was some showing of friction between IUE and non-member employees but at the same time, as we have heretofore shown, IUE time and again recognized the right of non-union members to remain as employees. As we have previously pointed out, the examiner recognized in his findings that there was no proof of any policy of IUE to discriminate against non-union members and that there was no union activity in or about the Company's plant. Dietz was a valuable employee and, unlike the common discharge situation, there is no proof that the Company had any purpose or desire to terminate her employment. No independent discriminatory motive on the part of the Company was claimed or found; in fact, so far as this record discloses, the Company had a well near perfect record in according to IUE as well as to its individual employees every right guaranteed by the Labor Act.

We can go no further in evaluating the circumstances in proof than to hazard a guess that the Company possessed the alleged knowledge, and we doubt if the Board could do more. But a finding cannot rest merely upon guess, suspicion or speculation predicated upon inferences arising from widely separated and inconsequential incidents. Particularly is this so when inferences are utilized to overcome direct and positive testimony. See Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613; A. E. Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868, and Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624. In the last cited case the Court refused enforcement of the Board's order against the Company for an alleged discriminatory discharge of an employee. The motivating cause was in issue as it is here. The Board had found an improper motive based upon circumstantial proof. In rejecting the finding as not substantially supported, the court stated, quite appropriate to the instant situation, as follows at page 631: "We do not lose sight of the fact that our inquiry is centered upon the motivating cause of the employer's action. The task is a difficult one. It involves an inquiry into the state of mind of the employer. Such inquiry is laden with uncertainties and false paths. Obviously our chief guide is the words of the witness under oath who undertook to disclose the workings of his mind. If his explanation is a reasonable one, the onus is upon the Board to establish the falsity of this explanation and the truth of its own interpretation. * * * Isolated statements which alone carry incriminating import often lose their ominous significance when surrounded by all the facts of a given case."

The meager circumstances relied upon by the Board as giving rise to an inference of knowledge so as to overcome direct proof to the contrary demonstrate the weakness of the Board's position. Those circumstances, as stated in its decision, are as follows: "(1) the Employer knew that Dietz had been a member of the UE, and that after the schism in 1949 she was not a member of the IUE; (2) in 1951, the employees had strenuously objected to her retention while IUE members were being laid off; (3) responsible company officials were on the production floor in September 1953 when the employees crowded around Dietz and taunted her for her nonmembership in the IUE; (4) the plant superintendent told the employees gathered there that he had a 'damned good idea' what it was all about; and (5) the Employer, in its socalled investigation of the stoppages, failed to call on Dietz's immediate supervisor, IUE officials, or any of the participating employees."

Without detailed discussion, we comment upon these five circumstances in the order in which they have been stated.

(1) The only proof of Company knowledge that Dietz was not a member of IUE is a letter written by the Company, dated August 22, 1950, addressed to Dietz, in which was enclosed a check for $16, representing dues withheld from her wages for a period prior to June 1950,

with the information that the Company had been advised by the union that she was not a member during that period. This letter was signed by Nicholas Mase, the Company's assistant personnel director. There is no proof that this knowledge on the part of Mase was conveyed to any other Company official. Moreover, Mase died February 27, 1951. How this incident which occurred more than three years prior to those in controversy has any relevancy is not understandable. Following this incident other non-member employees were accepted by the union as members and obviously the same thing could have happened to Dietz.

(2) It is true that in 1951 there was a demonstration by the employees against Dietz but there is no proof that the Company had knowledge of its purpose. In fact, as heretofore shown, president Sullivan of the local union induced the employees to return to their work. Dietz continued in her employment undisturbed for almost two years after that incident and for aught that is shown the Company might well have thought that whatever grievance the employees had against her in 1951 had been amicably adjusted.

(3) The evidence does show, of course, that the employees crowded around Dietz at the time of the work stoppages in controversy but there is no proof that any taunting remarks made to Dietz relative to her non-membership in the union were made in the presence or hearing of any Company official. In fact, the evidence shows that certain Company officials on the floor at that time were not in hearing distance.

(4) Dietz testified that Whisler, superintendent of the department in which she worked, made the statement attributed to him by the Board when he addressed the employees shortly after the September 15 demonstration began. Whisler was a witness for the Board but no inquiry was made of him as to whether he made the "damned good idea" statement or, if so, what he meant by it. Any meaning to be attached to the statement, if made, is a matter of conjecture but, in any event, indulging in the dubious inference that it referred to knowledge, the same was not communicated to Kertis who was the Company official solely responsible for the situation which developed between the Company and Dietz subsequent to the demonstrations.

(5) Much is said concerning the failure of the Company to properly investigate the purpose of the employees engaged in the work stoppages in controversy. The fact is that an investigation was made but evidently not sufficient to satisfy the Board's idea of what management should have done under the circumstances. Witnesses who were interviewed either refused to talk or answered that they did not know the purpose of the demonstrations against Dietz. In any event, even though it be assumed that the Company did not investigate the situation as thoroughly as it might, it is not discernible how any failure in that respect can now be utilized as proof of knowledge. In this connection it may also be noted that while the Board is critical of the Company's failure to investigate and ascertain the purpose of the demonstrating employees, it evidently has failed in the same respect. This may be assumed, we think, from the Board's failure to call as witnesses, employees who could have given direct testimony as to the purpose. Instead it relied upon tidbits of evidence picked from here and there which have little if any probative value.

■ The Board in its brief states the following principle of law: "An employer has an affirmative duty to resist the demands of a union or group of employees when to yield to those demands results in the denial of a statutory right conferred on another employee." It cites in support of this principle N. L. R. B. v. McCatron, etc., 9 Cir., 216 F.2d 212, 214–215; N. L. R. B. v. Newton, 5 Cir., 214 F.2d 472, 475; N. L. R. B. v. John P. Weissman Co., 6 Cir., 170 F.2d 952, 954, and N. L. R. B. v. General Motors Corp., 7 Cir., 116 F.2d 306, 309–311. Of course, the application of this

principle is dependent upon knowledge by the employer that the activities of the union or employees have a discriminatory objective. Thus, in the cited cases as in the instant case, knowledge on the part of the company becomes the critical issue, with the burden on the Board to establish it by substantial evidence. A reading of cases relied upon by the Board discloses factual situations which are a far cry from those shown here. Generally the employer was found guilty of independent unfair labor practices, a hostile union attitude or active participation by the employer in the discriminatory acts charged to the defending union or employees. For instance, in the General Motors Corp. case, this court stated at page 310: "Respondent seeks to justify this policy on the ground that to interfere with the men would have been to cause further excesses and more violence. This, however, fails to explain away the fact that the record also shows that foremen, assistant foremen, and others occupying a supervisory capacity, sometimes directly participated in the evictions." In the Weissman case the court stated 170 F.2d at page 954: "It is clear enough that the attitude of the anti-Union group of respondents' employees was encouraged, and tacitly, if not openly, approved by respondent Weissman * * *".

The same or similar conduct was attributed to the employer in the other cases. Under such circumstances knowledge on the part of the Company was readily inferable. In the instant case, however, none of these factors exist. As already shown, respondent Company had no motive or desire to discharge Dietz and it, like the union, gave no assistance either directly or indirectly to the group of employees who for some reason or other were hostile toward her. The predicament of Dietz was caused solely by the acts and conduct of an irresponsible group of employees and it is unfortunate that they cannot be held responsible. What action, if any, the Company should have taken in order to escape the accusing finger of the Labor Board

we do not know. The Company thought, and so did Dietz, that her personal safety was at stake. In our judgment, the course which the Company pursued was dictated by prudence and common sense and it should not be held guilty of embracing the improper and unlawful motive of the demonstrating employees, if such they had, upon proof of such a nebulous and uncertain character.

It follows that the Board's petition for enforcement of its order issued January 5, 1954, against the respondent Company and the respondent union, is denied, and the request of the respondents that the order be set aside is allowed.