NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 815, INTERNATIONAL BROTH-
ERHOOD OF TEAMSTERS, CHAUF-
FERS, WAREHOUSEMEN AND HELP-
ERS OF AMERICA, INDEPENDENT,
Respondent.

No. 264, Docket 26573.

United States Court of Appeals
Second Circuit.

Argued March 20, 1961.

Decided April 26, 1961.

Elliott Moore, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elizabeth W. Weston, Elliott Moore, Washington, D. C., Attys., N. L. R. B., for petitioner.

Benjamin Wyle, New York City (Luxemburg & Wyle, Benjamin Wyle and Bernard Wray, New York City, on the brief), for respondent.

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

This case concerns a decision and order, 127 N.L.R.B. No. 128, in which the National Labor Relations Board adopted the findings and conclusions of a trial examiner that Montauk Iron & Steel Corporation discriminated against Louis A. Ferland in violation of § 8(a) (1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a) (1) and (3), because he had been suspended from Local 815, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, for "dual union" activity; and that, by causing the company so to discriminate, Local 815 violated § 8(b) (1) (A) and (b) (2) of the Act, 29 U.S.C.A. § 158(b) (1) (A) and (b) (2). The order contains the usual cease and desist and notice provisions, as well as a requirement for back pay. The company has complied with the order; the Board petitions for enforcement against Local 815.

The claimed discrimination against this single employee, who apparently has been fully compensated by the company, lasted little more than a month. However, the Board and the union appear to regard the case as affording an opportunity to examine union responsibility for the acts of a shop steward "in illuminating isolation," Mr. Justice Frankfurter in Rogers v. Richmond, 1961, 365 U.S. 534, 81 S.Ct. 735, 743, 5 L.Ed.2d 760, fn. 4. Since the circumstances seem fairly typical, we shall treat it on that basis.

Montauk is engaged in the fabrication and sale of steel products in Long Island City, New York. For some ten years the company's employees, with certain exceptions not material here, have been represented by Local 815. On October 8, 1958, the company and the union entered into a collective-bargaining agreement, effective September 1, 1958, which was to remain operative for two years and to be automatically renewed for annual periods in the absence of timely notice to the contrary. The agreement contained a valid

union-security clause requiring all employees after thirty days to become and remain members of the union, a dues checkoff provision, and provisions requiring the company to contribute three dollars weekly per employee to an insurance and welfare fund and two dollars more to a separate fund for pensions and annuities. The selection of union stewards was provided for by a further clause, of which more hereafter.

During the spring of 1959, Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO, attempted to organize the company's fabricating department employees as a separate bargaining unit. Louis A. Ferland, an employee in that department and a member of Local 815, was active in behalf of the rival union and signed a card authorizing Local 455 to be his exclusive bargaining representative. On April 1, 1959, Local 455 filed a certification petition with the Board; this was dismissed in accordance with the Board's contract-bar rule. See Local 1545, United Brotherhood of Carpenters and Joiners of America v. Vincent, 2 Cir., 1960, 286 F.2d 127.

On June 9 Ferland appeared before the executive board of Local 815 to answer charges of disloyalty. He pleaded guilty to engaging in dual union activity and was fined $750—a sum no one expected him to pay—on penalty of suspension of union membership. Ferland testified that, in imposing sentence, the presiding union official advised him to contact Local 455 about getting a job, implying he could expect to lose his position with Montauk; this was denied by the union's recording secretary. Plotnick, who took minutes of the meeting. Ferland did not pay the fine, and on June 23, Spilberg, president of Local 815, wrote him that he had been suspended from the union. Spilberg also wrote Montauk as follows:

"Please be advised that Louis Albert Ferland has terminated his membership in this Union.

"In the future, please make no deductions for Dues or remittances for Welfare or Pension, for the employee involved."

Ferland was not delinquent in paying his dues. On the same day Ferland was notified by the trustee of the Welfare Fund that his insurance and welfare policies had been cancelled because he had lost his union membership, and Montauk made no further contributions to either fund on his account up to the date of the hearing.

When Ferland reported to work on June 24, he had not yet received Spilberg's letter. Shop Steward Floyd, who had been present at Ferland's disloyalty trial and to whom the union had sent a copy of the letter, showed this to Ferland and ordered him not to work. Then Floyd showed the letter to Foreman Novey, telling him "that Louis Ferland was no longer a union member and that the boys in the shop wouldn't work as long as Ferland was in the shop." Ferland testified that Novey told him if he did not quit "he would punch out my card"; Ferland kept on working. Later the other men stopped working, and Ferland was called in to see Goldstein, secretary-treasurer and a managing agent of the company. Goldstein testified he had spoken to the shop steward earlier "and asked him if he would sort of let things stay as they were until we could definitely determine what was to be done. He refused to go along with this * * *" Goldstein then told Ferland the company "would have to ask him to stay off his job a few days." According to Ferland and Tipelin, an organizer for Local 455 who was present at this interview, Goldstein showed them the letter from the union advising that Ferland had lost his membership and pointed out the union-security clause. Both also testified that Goldstein told them "he had received a phone call from the union, advising him to terminate my employment there." Ferland left the plant and the same day filed an unfair labor practice charge.

On June 30 Goldstein wrote Ferland there was a job for him. However, Ferland testified that when he came to work a day or two later Novey consulted Floyd,

and "the shop steward refused to recognize the letter. * * * [H]e did not hear from the union and as far as he was concerned that things were still as they were." Novey told Ferland to wait for Goldstein. When the latter arrived, he told Floyd that "everything had been straightened out with the union" and that Ferland could return to work; but Floyd responded, according to Goldstein, that "as far as he knew, there was no change." Ferland testified that Floyd repeated he had not heard from the union "and could not have taken it on his own to put me to work." Goldstein asked Floyd to let Ferland work until the company could get in touch with the union and straighten the matter out; Floyd refused, stating that if Ferland worked, "there would be a work stoppage." Ferland worked, and there was a work stoppage. When Novey informed him the men had stopped working, Ferland said "he knew what to do," changed his clothes, and left the plant. That same day Plotnick came to the plant. He testified that when he arrived the men "all started to clamor" and told him of their differences with Ferland. He said he told them "we want nobody walking off the job as long as this man is working here." He went to see Goldstein; they did not mention Ferland, but Plotnick told Goldstein "if he had any differences to talk to the shop steward and try to straighten it out," including work stoppages. Plotnick testified that even before this interview it was the practice for the company to discuss grievances with the steward.

On July 7 Goldstein wrote again to Ferland, offering him work out of doors. Ferland went to work July 13. Goldstein testified he had offered Ferland an outside job rather than an inside one because "the conditions on which I was able to take him back were rather nebulous and it was best to avoid friction * * * Whether it was the men themselves or the official people of the union, I do not know, but it was quite obvious that when Ferland was there, there was trouble." The following day it rained, and Goldstein told Ferland to work inside the shop. Goldstein's fears of trouble speedily materialized. According to Ferland, Floyd soon appeared "and told me that it was alright for me to work in the yard but not in the shop. * * * As far as he knew he was instructed by the Union not to let me work in the shop." Ferland called Goldstein; the latter told him "there wasn't anything else for me to do," and Ferland again left the plant.

On July 17 Goldstein again advised Ferland to come to work; but when Ferland appeared on July 20, foreman Novey told him there was no job for him and that "it was a mistake." On July 30 Spilberg wrote Goldstein, noting that Ferland had filed charges and informing Goldstein "we do not object to Mr. Ferland's continued employment by you." The same day Goldstein offered Ferland his old job. Ferland returned to work and has been steadily employed by Montauk ever since, except for a brief layoff concededly not involving discrimination.

The Board adopted findings of the Trial Examiner that the company and Local 815 took action to deprive Ferland of his benefits under the welfare and pension funds, that the company had discharged Ferland, that the discharge was caused by actions of Shop Steward Floyd and that the union was responsible for these, in violation of § 8(a) (1) and (3) by the company, and of § 8(b) (1) (A) and (2) by the union. The union attacks these findings as they concern it.

██ Local 815 does not deny that it requested Montauk to terminate payments to the welfare and pension funds on Ferland's account, and that Montauk complied. It asserts, however, that this did not subject Ferland to discrimination since he never was refused any services under welfare and pension plans and never presented a claim for benefits that was turned down. Whether Ferland's welfare and pension status was, in fact, impaired, the record does not clearly show. However, when a union causes an employer to cease making such payments for the account of an employee whose union membership has been terminated on grounds other than the non-payment of dues or initiation fees and who reasonably believes the cessation will adversely

affect him, as Ferland did, the union "cause[s] or attempt[s] to cause an employer to discriminate," even if the employee's belief is wrong. For such action has the necessary effect of encouraging membership in the contracting union and, on the facts here, of discouraging membership in a rival union. This violates "The policy of the Act * * * to insulate employees' jobs from their organizational rights." Radio Officers' Union v. N. L. R. B., 1954, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455, even if, due to complex insurance arrangements of which the employee is unaware, the action does not in fact have the result reasonably anticipated by him.

Local 815 denies it was responsible for Ferland's discharge, on four interrelated grounds: (1) That Shop Steward Floyd was not the cause of the discharge; (2) that if Floyd did cause the discharge, he was not acting as agent for the union; (3) that the union itself, far from taking any discriminatory action or urging it on the company, took "direct action" to prevent discrimination; and (4) that the decision is not supported by substantial evidence on the record as a whole. These arguments will be considered together.

■ In holding the union responsible for Ferland's discharge the Trial Examiner expressly disclaimed reliance on the testimony of Tipelin and Ferland that Goldstein said the union had asked him to make the dismissal, which Goldstein had neither corroborated nor denied, although the Examiner was free to consider that testimony if he chose. Nor did the Examiner base his findings on an interpretation of Spilberg's letter to Montauk as implying a demand that Ferland be fired for losing his union membership, although, when read in connection with the union-security clause, it might well have been so construed. Rather the Examiner found that Shop Steward Floyd was an active force in causing Ferland's discharge and that the union was responsible

for his actions. There is ample evidence to support these findings.

It cannot be doubted that for some purposes Floyd was an agent of the union. Paragraph Tenth of the collective-bargaining agreement provided that the union might elect or select shop stewards from among the employees, and the stewards "shall have the right to enforce such rules and regulations and to perform such other duties during working hours as may be required of them by the Union for the welfare of the members." Accordingly, the responsibility of the union for Floyd's particular acts must be determined by the general principles of agency law, N. L. R. B. v. International Longshoremen's & Warehousemen's Union, Local 10, 9 Cir. 1960, 283 F.2d 558, 563; International Longshoremen's Union, 79 N.L.R.B. 1487 (1948), and the specific direction of 29 U.S.C.A. § 185(e) that in determining the principal's responsibility "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

This provision serves to underscore the incontestable proposition that, in this field as elsewhere, a principal may be held responsible for the acts of an agent whom it has placed in such a position that persons dealing with the agent reasonably believe the acts to be authorized, Merchants' Nat. Bank v. State Nat. Bank, 1871, 10 Wall. 604, 645–647, 19 L.Ed. 1008.

Montauk was justified in believing that, in his representations as to Ferland, Floyd was acting for the union rather than as an individual or as a reporter for individual employees.[1] The company had always been expected to discuss grievances with the shop steward, it was customary for it to do so, and on July 1 or 2 Plotnick specifically requested Goldstein to do so in the future, with particular reference to work stoppages. The agreement indicated the union might empower stewards to enforce rules, and

1. The Third Circuit has suggested that the union steward is in a position of agency comparable to that of the employer's foreman, N. L. R. B. v. Brewery & Beer Distributor Drivers Local 830, 1960, 281 F.2d 319, 322.

the contractual requirement of union membership as a condition of continued employment was such a rule. In sending Floyd copies of its letters to Ferland and to the company, the union, if it did not in fact intend that Floyd take action to enforce the union-security clause, certainly gave him all the indicia of authority to do so. Thus when Floyd declared there might be a work stoppage and the men in fact stopped working, inferably as a result of his direction, the latter lay within the area where the union had invested Floyd with at least apparent authority. The Board was amply justified in finding that the evidence belied the contention that Floyd was a mere conduit of employee sentiment. He approached Ferland and Novey with the union's letters; he acted as though in charge by refusing to let a stoppage wait until clarification; he stated that he had not heard from the union. Moreover, the Board could properly draw an adverse inference from the union's failure to call Floyd as a witness. As for the union's contention that it took action to prevent discrimination, its letter of July 30, disclaiming any intention to have Ferland discharged, came too late to absolve it from responsibility for Floyd's earlier actions. The Trial Examiner was not required to believe the self-serving testimony of Spilberg and Plotnick that at the time of the first and second stoppages the union had told both Floyd and the strikers the men were not to refuse to work with Ferland.

Certainly a union is not responsible for every act of a shop steward, simply by virtue of his position. If he acts only as an individual rather than within the authority the union has conferred, the union is absolved. N. L. R. B. v. Shen-Valley Meat Packers, Inc., 4 Cir., 1954, 211 F.2d 289; Reynolds v. Local 522, Lumber Drivers, etc., I. B. T., D.C. N.J.1958, 35 CCH Labor Cases par. 71,-906; cf. Kovach v. N. L. R. B., 7 Cir., 1956, 229 F.2d 138, 139. But whether an agent has acted within the scope of his authority, actual, inherent or apparent, is a "question of fact" within § 10(e) of the Labor Relations Act, 29

U.S.C.A. § 160(e), as to which the finding of a trial examiner, adopted by the Board, can be set aside only if unsupported by substantial evidence on the whole record. For the issue involves solely the drawing of inferences from the raw facts in evidence; the meaning of the statutory and decisional standards of law is not disputed. N. L. R. B. v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583, 591–592.

Two Courts of Appeals have affirmed union responsibility for discriminatory discharges on the basis of stewards' statements nearly identical with those made by Floyd. N. L. R. B. v. International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers, Local 249, 3 Cir., 1957, 249 F.2d 292 [threat of discharge and work stoppage, despite by-law provision prohibiting his calling strike without union authorization]; N. L. R. B. v. International Longshoremen's & Warehousemen's Union, Local 10, 9 Cir., 1960, 283 F.2d 558 [threat of discharge and work stoppage]. See also N. L. R. B. v. United Broth. of Carpenters & Joiners, Local 55, 10 Cir., 1953, 205 F.2d 515; N. L. R. B. v. Local 1016, United Broth. of Carpenters & Joiners, 2 Cir., 1960, 273 F.2d 686.

Against these Local 815 relies on N. L. R. B. v. P. R. Mallory & Co., 7 Cir., 1956, 237 F.2d 437. There, as here, shop stewards had participated in work stoppages, there in demonstrations, which the Court characterized as "mob action," designed to cause the employer to discharge an unpopular employee. In denying enforcement because of insufficient evidence to support the finding of union responsibility, the Court relied principally on two factors: first, that the two hundred stewards in the plant were elected by their own small units, had no authority beyond the groups that elected them, and were not compensated by the union; and second, that the strike was contrary both to a no-strike clause in the collective-bargaining agreement and to a known union policy, the stewards having been informed by the union that such stoppages were unlawful. We find it unnecessary to express an opinion as to either ground, for the

case is plainly distinguishable. In Mallory there was nothing to show that the stewards attempted to speak with representatives of the company about the union's grievance; here, as in the Third and Ninth Circuit cases, the steward acted as spokesman in presenting demands for discharge to the employer. Moreover, more centralized union responsibility for matters affecting the entire plant must have been required in Mallory, where there were 200 stewards, than here, where there was but one. Also, the Seventh Circuit itself, in N. L. R. B. v. Local 135, International Broth. of Teamsters etc., 1959, 267 F.2d 870, 873, has limited Mallory by declaring it to have been "based largely on the undisputed fact" that the stewards were acting contrary to known union policy and instructions, holding the decision inapplicable in the later case where the stewards were furthering union desires by refusing to accept hot cargo. Here Floyd aided what the Board was justified in finding to have been the union's policy to penalize Ferland for his disloyalty, *non constat* that such a policy was unlawful.

Enforcement granted.