321 F.2d 807
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, LOCAL NO. 83, AFL-CIO, Respondent.
 No. 17175.
 United States Court of Appeals Eighth Circuit.
 August 28, 1963.
 
 Jules H. Gordon, Atty., N. L. R. B., Washington, D. C., for petitioner, and Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N. L. R. B., Washington, D. C., on the brief.
 Harry H. Craig, St. Louis, Mo., for respondent and Gibson Langsdale, Kansas City, Mo., and Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., on the brief.
 Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and YOUNG, District Judge.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This case is before us upon the Board's petition, pursuant to § 10(e) of the National Labor Relations Act as amended,[1] for enforcement of its order issued February 13, 1961, against Local 83. The respondent union filed a cross-petition to review and set aside the order. The Board's decision and order is reported at 130 NLRB 184. The findings and conclusions of the Trial Examiner, which the Board adopted, are reported with the Board's decision.
 
 
 2
 The labor dispute here involved arose in Missouri, within this circuit. The employer, Combustion Engineering, Inc., is engaged in commerce. Local 83 is a labor organization within the meaning of the Act. This court has jurisdiction under §§ 10(e) and 10(f) of the Act.
 
 
 3
 The Board upheld the General Counsel's contention that Local 83 violated § 8(b) (2) and (1) (A) of the Act by causing the employer to discriminatorily discharge employees Findley, Markus and O'Connor because they were not members in good standing in the union.[2]
 
 
 4
 Findley, Markus and O'Connor, prior to their expulsion by Local 83 on February 2, 1959, had been members of the union. The expulsions were for reasons other than nonpayment of dues and initiation fees. These men had opposed the election of Akers as business manager of the union and had instigated litigation against the union, and had thereby incurred the enmity of many of the union members. The reason for the expulsion is not definitely disclosed by the record and such reason is not material to the issues here presented.
 
 
 5
 In March, 1959, Combustion Engineering, Inc., the employer, was building a large steam-power boiler and doing some repair work at the Montrose Station of the Kansas City Power & Light Company. The employer procured all of its boilermaker employees for the project from Local 83. The union and the employer were parties to a collective bargaining agreement which permitted but did not require the employer to procure its boilermakers from Local 83. The union operated a hiring hall under the supervision of its business manager, William Akers. An applicable collective bargaining agreement required men to be certified for employment on a nondiscriminatory basis.
 
 
 6
 Findley, Markus and O'Connor registered for employment at the union hiring hall. When Findley's name was reached on the register, he was referred to the employer for employment with directions to report at the job site on the following morning, Wednesday, March 25. Under like circumstances, Markus and O'Connor were directed to report for work at the employer's job site on March 26.[3]
 
 
 7
 When Findley reported at the job site on March 25, he was accepted for employment. He was taken to the work site by union steward Henry Redel and told to work with the Ira Sparks' gang on top of the boiler. There were some 30 boilermakers on the job, all of whom were union members. Shortly after Findley came on the job, the union members started to leave the job. A number of the workers, including steward Redel, announced in the presence of others that they would not work with an employee without a union card. Within a short period, all boilermakers had left their work stations and at the suggestion of Redel had assembled in the workers' lounge room. Foreman Davis, steward Redel and Findley went to the office of the job superintendent, Bevlin. Bevlin called Akers and reported that the men had left the job because of Findley's appearance. Akers responded that he could not force the men to stay on the job. At Akers' request, Redel was put on the telephone. He was told to advise the men to go back to work. Redel answered that he would do so but that he did not think that it would do much good. There is some dispute as to what Redel said when he went out to the workers. The Examiner and the Board credited Findley's testimony that Redel said to Findley, "Why don't you go home; these men won't work with you, you don't have a ticket."
 
 The Trial Examiner states:
 
 8
 "Findley, Davis, and Redel then walked out of the office and outside the door Redel again said, `why don't you go home.' Findley replied that he did not have to go home. Findley then walked back through the office to the toolroom where Parks, the toolroom attendant asked him why he did not go home. Outside the toolroom the majority of the boilermakers, who had walked off the job, as previously described, were waiting in a type of anteroom provisioned with several vending machines. Redel walked up to the group of boilermakers and said, any of you men that want to work with Findley can go back to work. Many of the men replied that they did not want to work with Findley because he did not have a ticket. Those present, including Redel, then threw in their brass and proceeded to go home."
 
 
 9
 Some of the boilermakers who had walked off the job reported at union headquarters that afternoon and told Akers what had happened. Subsequently, Akers told Findley to report back to the job the next day (Thursday) and he also directed Markus and O'Connor to report for work at such time. While Markus and O'Connor were being processed in the employer's office, Boofer and Bruin, union members, were also being processed. Redel asked Boofer and Bruin, "Are you fellows going to work with these two? They haven't got a ticket." Bruin said no. Boofer said he would do whatever Akers wanted him to do. Redel repeated that the men had no union cards. Boofer then shook his head negatively. None of the men went out on the job that day. All went home shortly after 8 a. m., the time scheduled for commencing work.
 
 
 10
 Pursuant to directions given, most of the workers reported at union headquarters that afternoon and were advised orally and by letter that they did not have permission to walk off the job and they were ordered to return to the job and work.
 
 
 11
 Meanwhile, after the refusal of the men to work on Wednesday and Thursday, the employer's superintendent reported the walkout to his superiors. The company was under pressure to expedite the work. The superintendent was directed to terminate the employment of Findley, Markus and O'Connor.
 
 
 12
 Findley, Markus and O'Connor reported for work at the job site on Friday morning, as did most of the union employees. Findley, Markus and O'Connor were handed termination slips, stating that their employment was terminated for causing dissent on the job, just before the 8 a. m. starting hour. Thereupon the union men went out to the work site to perform their jobs.
 
 
 13
 The Board and Examiner found that the employer was not advised that the union members had been ordered to work before it terminated the nonunion employees and the Board places significance upon such lack of communication.
 
 
 14
 We agree with Local 83's contention that the Taft-Hartley amendments to the Act place greater responsibility upon courts of appeal for determining the fairness and reasonableness of Board decisions. The substantiality of the evidence must be determined "upon the record considered as a whole." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the landmark case in this area, discusses in considerable detail the question of the scope of review of Board decisions. Among other things, the court states:
 
 
 15
 "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. 490, 71 S.Ct. 466.
 
 
 16
 See also Gem International, Inc. v. N. L. R. B., 8 Cir., 321 F.2d 626; Osceola County Co-op. Creamery Ass'n v. N. L. R. B., 8 Cir., 251 F.2d 62, 64.
 
 
 17
 The Board, by adopting the Examiner's findings and conclusions, determined that in terminating the nonunion employees, "the Company acted under the impetus of the events of March 25 and 26 as they took place on the job site and these events made it abundantly clear that the union members, with the acquiescence and encouragement of the Union, were not going to work with Findley, Markus and O'Connor because these three men were not union members," and that the union had violated § 8(b) (1) and (2) of the Act by causing the employer to discharge Findley, Markus and O'Connor because of their nonmembership in the union.
 
 
 18
 Local 83 makes the contention that the activity of steward Redel cannot be relied upon to support the claim of union action, since Redel had neither actual nor apparent authority to call, induce or support the work stoppage. Under the record, we are satisfied that the Board was justified in holding that Redel was acting as an agent for Local 83 and that the union is responsible for his activities.
 
 
 19
 The issues of whether steward Redel was acting as agent for the union and whether he acted within the scope of his authority, actual, inherent or apparent, are fact issues. If a steward acts as an individual rather than within his authority as an agent, the union is not responsible. Responsibility of the union for particular acts of a steward must be determined by general principles of agency law. N. L. R. B. v. Local 815, International Bro. of Teamsters, 2 Cir., 290 F.2d 99, 103; N. L. R. B. v. International Longshoremen's & Warehousemen's Union, 9 Cir., 283 F.2d 558, 563.
 
 
 20
 29 U.S.C.A. § 185(e) specifically provides:
 
 
 21
 "[I]n determining whether any person is acting as an `agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."
 
 
 22
 In comparable situations, courts of appeal have held the union responsible for the steward's actions. N. L. R. B. v. Local 815, International Bro. of Teamsters, supra; N. L. R. B. v. International Longshoremen's & Warehousemen's Union, supra; N. L. R. B. v. Brewery & Beer Distributor Drivers, 3 Cir., 281 F.2d 319; N. L. R. B. v. Local 135, International Bro. of Teamsters, 7 Cir., 267 F.2d 870.
 
 
 23
 Article II, § 10, of Local 83's constitution, places the responsibility for the appointment of job stewards in the business manager. The union men reported their intention to walk off to the steward. At his direction, they assembled in the lounge while the steward was interviewing company representatives and reporting by telephone to business manager Akers. Mr. Akers specifically directed Redel to deliver a message to the employees. Moreover, it would appear that the steward was the highest ranking union representative on the job. Although there was difficulty on the job on Wednesday and reason to anticipate further difficulty on Thursday and Friday, Mr. Akers did not go out to the site of the trouble or send anyone else to represent the union. The negotiations with the employer were conducted by Mr. Redel.
 
 
 24
 The Board's determination that Redel's activities on the job were within the scope of his authority as steward and that the union is responsible for such activity, is supported by substantial evidence.
 
 
 25
 It is the union's contention that the work stoppage was induced by individual action of the employees, brought about by personal dislike of Findley, Marcus and O'Connor, as well as their personal desire not to work with nonunion members. There is substantial evidence to support the Board's finding that the walkout was caused by the refusal of the union members to work with nonmembers. There is no direct evidence that Local 83 ordered its members to refuse to work with nonunion members or that it ordered its members to walk off the job. Nevertheless, a careful examination of the record, the Examiner's report, and the Board's order convinces us that there is substantial evidence to support the Board's finding that the union induced the walkout which led to the discharge of the nonunion employees. The report of the Examiner, adopted by the Board, carefully analyzes the evidence, makes credibility findings, and draws reasonable and permissible inferences from the evidence. We shall not attempt to set out the rather extensive evidence. The reported Board opinion adequately demonstrates that the Board's findings are supported by substantial evidence and that the Board's decision is not induced by any erroneous view of the applicable law.
 
 
 26
 The Board's petition for enforcement of its order is granted.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C.A. § 151 et seq. Statutory references in this opinion, unless otherwise indicated, are to such Act
 
 
 [2]
 The Board's order is also directed against the employer for redress for discriminatorily discharging said employees. The Board in its petition here states: "The Company having complied with the Board's Order, the Board is not requesting enforcement against that Company."
 
 
 [3]
 No one challenges the legality of the work referral or the hiring procedure